# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2152

_____

| | | |
|---|---|---|
| Abraham Brima Bah, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| | * | Appeal from the Board of |
| v. | * | Immigration Appeals. |
| | * | |
| Alberto Gonzales, Attorney General of | * | |
| the United States, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: January 13, 2006
Filed: May 15, 2006

_____

Before LOKEN, Chief Judge, McMILLIAN[1] and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Petitioner Abraham Brima Bah seeks review of the Board of Immigration Appeals' (BIA) denial of his application for asylum, withholding of removal, and relief under the Convention Against Torture. In denying asylum, the BIA held that Bah failed to demonstrate past persecution. As a result, the BIA placed the burden on

_____

[1]The Honorable Theodore McMillian died on January 18, 2006. This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. Rule 47E.

Bah to prove a well-founded fear of future persecution based on existing country conditions. We find that the record compels a finding of past persecution based upon a protected status. Accordingly, there exists a presumption of a well-founded fear of future persecution, and we remand with the burden on the government to establish changed conditions.

I.

Bah was born in the city of Kakata, Liberia, in 1968. He is Muslim and a member of the Mandingo tribal group. In 1989, Charles Taylor and his rebel forces started a war against the government of Liberia. In July 1990, Taylor's rebel forces reached the Mandingo quarter of Kakata and killed Mandingos based on the belief that the Mandingos supported the government. Mandingo men like Bah's father wore traditional gowns and were easily recognizable by the rebel forces. Bah hid on the roof of his father's house and watched the rebels kill his father with a machete-like sword called a cutlass. The rebels proceeded to loot and ransack the home. The rest of Bah's family, including his mother, three brothers, and one sister, escaped. Bah's mother was from the Grebo ethnic group and was not Mandingo. Bah eventually fled to Sierra Leone where he lived as a refugee for six years.

During a cease fire in 1996, Bah returned to Liberia and found his mother and three brothers in Monrovia. He did not find his sister, whose fate remains unknown. He returned to the house in the Mandingo quarter of Kakata where a predominately Mandingo rebel group was in control. However, violence continued at that location, and he did not stay. An election was scheduled for 1997. He joined the All Liberia Coalition Party (ALCOP) and became the assistant secretary general for a youth wing of ALCOP. In this capacity, he organized meetings and a rally and encouraged people to vote against Charles Taylor.

Taylor won the 1997 election and supporters of the Taylor government began persecuting members of ALCOP. The leader of ALCOP fled the country, but Bah could not afford to leave Liberia at that time. Taylor's forces threatened to kill Bah if he continued to oppose Taylor. The forces also threatened other Mandingos, including Bah's family. In 1998, Taylor's forces burned the family's Kakata house.

Bah then found a job working for the German Technical Corporation. The company worked with the United Nations to return Liberian refugees to Liberia from Guinea, Sierra Leone, and other places. The company also distributed relief supplies to refugees. Fighting between the Taylor government and resistance forces continued. In 1999, while Bah was in a convoy relocating refugees, police from Taylor's government stopped him at a checkpoint to look for dissidents or rebels. The police arrested Bah and placed him in prison where they interrogated him and threatened him with death in an effort to obtain information about dissidents. The police accused Bah of transporting rebels and confined him for two days without food or water in a cell that was too small to permit him to stand. While squatting in the cell for these two days, Bah injured his spine. The company was able to secure his release by working with the Taylor government's defense ministry. After release from this first incarceration, Bah learned that three of his Mandingo relatives, one aunt and two cousins, had been murdered.

Bah temporarily stopped moving refugees, but the Taylor government reached an agreement with the United Nations regarding the repatriation of refugees, and Bah was told that it would be safe to resume work transporting refugees. Fighting between rebels and Taylor's government intensified, however, and, in early 2001, Taylor's police again stopped Bah at a checkpoint. Again, they imprisoned and threatened Bah and accused him of transporting rebels. A colonel in Taylor's forces was the father of one of Bah's childhood friends. The friend's father was able to obtain Bah's release, but the colonel warned that Bah would be killed if he stayed in Liberia. The

colonel told Bah that Taylor's police removed prisoners under the auspices of transporting them to Monrovia but killed the prisoners along the way.

Bah then went to a suburb of Monrovia where he stayed with his mother, who was not Mandingo. Bah had a cousin on his mother's side of the family who was a colonel with Taylor's police force in Monrovia. The cousin said that Bah's name was on a blacklist of persons to be eliminated. Bah then disguised himself and hid. Taylor's forces raided the home but did not find Bah. They destroyed Bah's property and beat his brother. Two of Bah's coworkers were arrested, and Bah decided to leave the country. The German company wrote to the American embassy on Bah's behalf, and Bah obtained a visa. Bah did not encounter difficulty obtaining a passport. Bah's cousin in the police force moved Bah through government checkpoints and helped Bah get on a flight out of Liberia.

Bah was married by the time he left Liberia. His wife and mother remain in Liberia.[2] His wife, like his mother, is not Mandingo, and neither of them have been harmed. At the time of the hearing before the immigration judge, Charles Taylor was in exile in Nigeria, and a different government was in place. Soldiers from Taylor's security forces continued to pose a danger in Liberia, however, because many remained in the security forces and others formed roving gangs. Bah testified that he feared returning to Liberia because he believed the security forces were still headed by former Charles Taylor supporters and because he feared reprisal from the gangs of former Charles Taylor supporters.[3]

---

[2]While it is generally true that the presence and safety of family members in a country may suggest an absence of danger, in this case it is important to note that neither Bah's wife nor his mother are Mandingo, and there is no evidence to suggest that either woman was at any time politically active or involved in activities likely to draw the ire of Charles Taylor supporters.

[3]The record contains substantial additional testimony and documentation regarding conditions in Liberia between the time of Bah's departure and the final

Bah entered the United States in 2001 as a non-immigrant visitor for pleasure. His visa permitted him to remain in the United States until October 2, 2001. On September 4, 2001, while still legally present in the United States under the visa, he filed an application for asylum. Ultimately, he overstayed his visa and the Immigration and Naturalization Service (now the division of Immigration and Customs Enforcement within the Department of Homeland Security (DHS)) commenced removal proceedings. Bah conceded removability but sought asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3), and relief under the Convention Against Torture, 8 C.F.R. § 208.16(c)(2). In the alternative, he sought voluntary departure.

At Bah's preliminary removal hearing, the immigration judge asked if Bah had temporary protected status under 8 U.S.C. § 1254a(a)(1)(A) and if Bah was going to move to administratively close (suspend) the removal hearing. Temporary protected status was available to Liberian citizens at that time because Liberia was designated as a state where there was "an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state . . . would pose a serious threat to their personal safety[.]" 8 U.S.C. § 1254a(b)(1)(A). Bah's counsel answered that Bah was about to apply for temporary protected status but that he was not going to move to administratively close the removal hearing. The immigration judge scheduled a final hearing for November 5, 2003.

_____

removal hearing. Because of our disposition of this matter, we need not discuss that part of the record. It suffices to note that the record reflects ongoing instability and great uncertainty regarding the actions of Charles Taylor's forces within the government and security forces as well as the criminal actions of those forces acting outside the government. At a minimum, the evidence in this case establishes that we cannot treat as harmless error the failure to place the burden of proof on the government to prove changed conditions.

At the beginning of the November 5 hearing, the immigration judge asked Bah if he had obtained temporary protected status, which he had. Counsel for the DHS then moved to administratively close (suspend) Bah's removal proceedings and take the case off the calendar. This request was, in essence, a request that Bah and his attorney, who had not previously worked in the area of asylum, consent to administrative closure. A discussion ensued between Bah's counsel and the immigration judge during which the immigration judge explained temporary protected status to the attorney. The immigration judge stated that administrative closure could occur by consent of both parties and that the case would truly be suspended until such time that either party moved to place the case back on the calendar. Counsel for the DHS informed Bah that administrative closure was only available at that particular time because, if Bah forced the DHS to proceed with the hearing, the DHS would not in the future agree to an administrative closure.

Bah elected to proceed with the removal hearing. After hearing testimony and receiving evidence, the immigration judge rejected most of Bah's requests for relief but granted him voluntary removal. The immigration judge stated that she found Bah generally credible. In addition, she did not expressly reject any factual assertions that Bah made at the hearing either by finding him not credible as to any particular statement or demanding additional corroboration as to any particular claim.[4] Instead, she drew different legal conclusions than Bah based on the evidence and explained his various encounters with Charles Taylor's forces as isolated, unconnected events that did not amount to persecution. She stated:

> The Court will find that the respondent personally has not suffered past persecution based on one of the five grounds enumerated in the Act. The respondent's two instances of being arrested and harmed stem from when he was stopped at checkpoints when he was working for the GTC

---

[4]In this regard, we note that there was documentary corroboration of many of Bah's claims.

company. The respondent was arrested for several days on the belief that he might be transporting rebels. On one occasion, the GTC got the Ministry of Defense to write a letter to the prison to let the respondent out and he was released. The other time, the respondent's cousin, Colonel Sheriff, came and got the respondent released.[5] The Court does note that the respondent's father was killed in the early time frame of the war. Although that is a tragic event, the Court finds that the respondent was not harmed personally and the Court further notes that there is a change in country conditions that is ongoing today.

With respect to whether or not the respondent has a well-founded fear of future persecution, the Court notes that there are ever changing country conditions in Liberia. Charles Taylor fled Liberia in approximately August of 2003 and is in exile in Nigeria. There is a new interim government which is led by Gyude Bryant, who has a newly installed power-sharing government. Accordingly the government that the respondent fears had this leaders who had left. The court does believe that there are Charles Taylor supporters who are still in Liberia and causing problems. However efforts are being made and apparently will continue to be made to stop the roving band of gangsters who are terrorizing the population which is referenced in the BBC article in Exhibit No. 10. Jacques Klein indicated in the interview that leadership is weak and there are roving bands of gangsters terrorizing the population. Accordingly, the Court acknowledges that there continues to be civil unrest in Liberia. However, the respondent's wife has returned to Liberia from the Ivory Coast and has not been harmed despite the fact that she is of a different tribal group than the respondent. Furthermore, the respondent's mother continues to live in Monrovia, Liberia. The respondent has Temporary Protected Status for Liberians. The Court believes that the appropriate remedy is the Temporary Protected Status that has been given him by the United States Government, which allows the respondent to remain in the United States and work in the United states until such time as the United States

---

[5]This statement is an erroneous recitation of the record. The colonel who secured Bah's release from incarceration was the father of a childhood friend, not Colonel Sheriff.

Government deems that it is safe for the respondent and others in his circumstances to return to Liberia.

The immigration judge went on to note that Bah also failed to meet the higher standards for withholding of removal and relief under the Convention Against Torture.

Bah appealed, and the BIA affirmed "based upon and for the reasons set forth" in the immigration judge's opinion. On appeal to this court, Bah challenges the finding of no past persecution. In the alternative, he challenges the finding of no well-founded fear of future persecution. He argues not only that his personal history suffices to demonstrate past persecution and a well-founded fear of future persecution, but that the immigration judge erred as a matter of law by permitting the availability of temporary protected status to impact her analysis of persecution. Finally, he argues that the period of voluntary removal should be tolled pending expiration of temporary protected status.

II.

The BIA is entitled to substantial deference. We must affirm the BIA's finding of no past persecution unless the record compels a finding of past persecution based on a protected ground. INS v. Elias-Zacarias, 502 U.S. 478, 481 & n.1 (1992); 8 U.S.C.A. § 1252(b)(4)(B). Here, we believe the record compels such a finding. Bah witnessed his father's murder at the hands of Taylor's forces, and that murder was motivated by two prohibited reasons: membership in a tribal group and imputed political opinion. Bah's sister disappeared, and Bah was forced to live for six years as a refugee in Sierra Leone. Taylor's forces threatened Bah and Bah's family with death after Bah returned to Liberia and campaigned against Taylor prior to the 1997 election. Taylor's forces burned Bah's family's home in apparent retribution for Bah's participation in the ALCOP campaign against Taylor or because of Bah's Mandingo heritage. Taylor's forces also destroyed Bah's personal property and beat

his brothers. Taylor's forces twice imprisoned Bah based on the belief that Bah was smuggling rebels into the country. See De Brenner v. Ashcroft, 388 F.3d 629, 635-36 (8th Cir. 2004) (stating that it is the belief of the persecutor that determines whether persecution was based on a protected ground). Bah was blacklisted for elimination. He was released from imprisonment once through the aid of his employer and once through the aid of a colonel in Taylor's forces, the father of a childhood friend. The father of Bah's childhood friend told Bah that Taylor's forces were taking prisoners from Bah's location under the auspices of transport to a different facility in Monrovia, but killing the prisoners en route. Bah's cousin, a non-Mandingo relative on Bah's mother's side who was also a colonel in Taylor's police force, escorted Bah through checkpoints to permit Bah's escape from Liberia. It was this cousin who told Bah that he was blacklisted. We find this evidence sufficient to compel a finding of past persecution.

The burden of proof is always on the alien to establish past persecution. El-Sheikh v. Ashcroft, 388 F.3d 643, 646 (8th Cir. 2004). A well-founded fear of future persecution is presumed to exist if an alien demonstrates past persecution. Id.; 8 C.F.R. § 208.13(b). With a demonstration of past persecution, the burden falls on the government to prove a change in country conditions sufficient to overcome the presumption of a well-founded fear of future persecution. Id. Because the record compels a finding of past persecution, Bah is entitled to relief unless the DHS proves sufficiently changed country conditions.[6]

We grant the petition for review and remand to the BIA for assessment of changed country conditions with the burden of proof on the government.

_____

_____

[6]As noted above, supra at n.3, the record in this case does not demonstrate such a dramatic change in conditions within Liberia that we may resolve this issue on the present record. Further, conditions in Liberia have continued to change since the time of Bah's removal hearing. Those ongoing changes are material and should be considered on remand.