# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2939

_____

Wilfred Abayomi Cooke;     *
Alice M. Cooke,    *
   *
       Petitioners,    *   Petition to Review
   *   Decision of the Board of
     v.    *   Immigration Appeals
   *
Michael Mukasey, Attorney General,    *
   *
       Respondent.    *

_____

Submitted: June 9, 2008
Filed: August 14, 2008

_____

Before SMITH, BOWMAN, and GRUENDER, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Wilfred and Alice Cooke petition for review of an order of the Board of Immigration Appeals (BIA) affirming the decision of an immigration judge (IJ) to deny their applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT). The Cookes are natives and citizens of Liberia who allege that they fear persecution in Liberia based on Mr. Cooke's political beliefs. We conclude that Mr. Cooke suffered past persecution on account of his political beliefs but that the IJ did not abuse her discretion in determining that conditions in Liberia have changed such that the Cookes no longer

have a well-founded fear of being persecuted if they were to return.  We therefore deny the petition for review.

## I.

The Cookes entered the United States as nonimmigrant visitors for pleasure and remained beyond the periods authorized by their visas.  In June 2000, within a year of his entry, Mr. Cooke filed an affirmative application for asylum and withholding of removal that included Mrs. Cooke as a derivative beneficiary.  The Immigration and Naturalization Service, now known as the Department of Homeland Security (DHS), began removal proceedings against the Cookes in July 2002.  See Immigration and Naturalization Act (INA) § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B).  At an initial administrative hearing on October 24, 2002, the Cookes conceded removability.  In November 2003, the parties agreed to administratively close (suspend) the case because the United States had granted Liberians Temporary Protected Status (TPS).[1] DHS moved to recalendar the case in November 2004, despite the fact that TPS was still in place for Liberians.  The IJ held an additional hearing on March 29, 2006.

Mr. Cooke seeks asylum based on his membership in the Unity Party of Liberia and his opposition to the party headed by Charles Taylor, the National Patriotic Front of Liberia.  Documents in the record and Mr. Cooke's testimony show that Mr. Cooke joined the Unity Party in 1985 and was responsible for recruiting members to the party.  Mr. Cooke's brother Peter Cooke was also active in the Unity Party and ran for political office as a member of that party.

---

[1]TPS was made available to Liberian citizens because the Attorney General designated Liberia as a state where there was "an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state . . . would pose a serious threat to their personal safety."  8 U.S.C. § 1254a(b)(1)(A); see also Bah v. Gonzales, 448 F.3d 1019, 1022 (8th Cir. 2006). The current grant of deferred departure for Liberians extends through March 31, 2009. See http://www.dhs.gov/xnews/releases/pr_1189693482537.shtm.

In 1987, Mr. Cooke began working as an accountant for the Liberian Ministry of Finance (MOF). At that time, Samuel Doe was the president of Liberia. But in December 1989, Taylor launched an armed uprising to overthrow Doe's government. Civil war broke out. In May 1990, when Taylor's rebel troops approached the capital city of Monrovia, the Cookes left the city and moved with their children to another house that they owned in Cape Mount, Tallah.

Mr. Cooke testified that in June 1990, he was at his home in Cape Mount when he heard gunfire in his front yard. When he went outside, he saw about seven of Taylor's rebels with guns. The rebels asked him if he was the Wilfred Cooke who used to work for the MOF under the Doe government. When Mr. Cooke said yes, the rebels accused him of "helping the government squander the peoples [sic] money." Admin. R. at 931. They struck him on the head several times with the butts of their AK-47 rifles. Mr. Cooke fell unconscious. The rebels stripped him naked and tied him up. Then they carried Mr. Cooke to an abandoned schoolhouse and threatened to kill him. The townspeople began pleading for Mr. Cooke's release and gave the rebels a bribe of around $300–$400. At that point, the rebels released Mr. Cooke. He was taken to a clinic and his head wound was treated. The beating left a scar on Mr. Cooke's head and resulted in an enlarged blood vessel on his forehead. The IJ observed that Mr. Cooke has "an indent" going from side to side on the top of his head. Id. at 151. Medical reports indicate that Mr. Cooke has a "sunken ridge between the frontal and parietal regions" of his head. Id. at 482. Mr. Cooke testified that he has a "pulsing" in his head. Id. at 172. He was treated for this condition in Liberia from 1996 to 1999, and documents in the record show that he has continued treatment in the United States. He takes prescription medication for head pain. Mrs. Cooke testified that Mr. Cooke also suffers from memory problems since the beating.

Doe was killed by rebels in September 1990. In November 1990, the Cookes fled to Sierra Leone, where they were given refugee status by the United Nations (U.N.). They lived in a refugee camp erected in a sports stadium. Mr. Cooke was

treated at a hospital in Sierra Leone for pain in his head. In 1992, an interim government was established in Liberia and the Cookes returned to Liberia. Mr. Cooke went back to work at the MOF under the interim government. Taylor, however, continued to cause trouble in Liberia.

The next alleged act of persecution by Taylor's troops was suffered by Mrs. Cooke in June 1997, when Mr. Cooke was in the United States visiting his mother. Mrs. Cooke testified that seven or eight of Taylor's rebels came to her house in the middle of the night and demanded information about Mr. Cooke. The rebels said that they had heard that Mr. Cooke had gone to the United States to raise funds for the Unity Party. They pushed Mrs. Cooke and struck her back with a belt. Her back was cut by the belt buckle and began to bleed. The rebels held her children at gunpoint, threatening to kill them if they cried. The rebels stole clothing and money and then left. Mrs. Cooke was treated at a clinic for the wound on her back. Upon being told the next day of the attack, Mr. Cooke returned to Liberia. Mrs. Cooke applied for a passport, which was issued on February 24, 1998. She then got a United States visa, which was issued on May 13, 1998. She entered the United States on June 19, 1998. Both Mr. Cooke and Mrs. Cooke testified that a scar from the beating remains on Mrs. Cooke's back.

An election was held in Liberia in July 1997. Mr. Cooke's brother Peter Cooke ran unsuccessfully as a Unity Party candidate for the legislature. Taylor defeated Unity Party candidate Ellen Johnson-Sirleaf to become President of Liberia. Mr. Cooke remained in his position at the MOF. He testified that sometime in early 1998, he leaked information to the press about government corruption by high-ranking officials in Taylor's party. Mr. Cooke exposed that the Deputy Minister of Revenue had embezzled government money.

Mr. Cooke testified that in August 1998, police from Taylor's government burst into his office at the MOF. The police declared that Mr. Cooke's brother had signed

a document that would have allowed Johnson-Sirleaf to obtain money from the U.N. to overthrow Taylor's government and that Mr. Cooke "was part of it."[2] Admin. R. at 159. The police took Mr. Cooke to a police station. He was detained, stripped to his underwear, and put in a cell shared by seven other people and having no toilet facilities. He was later taken to an interrogation room filled with smoke. The police interrogated him about his and his brother's involvement with the Unity Party. They also accused Mr. Cooke of leaking information about government corruption to the press because he belonged to a party other than Taylor's party. After about twenty minutes of exposure to the smoke, Mr. Cooke fainted. After two or three days of questioning, the authorities released Mr. Cooke but told him to report to the station every few days.

Mr. Cooke testified that he came to the United States in October 1998. In March 1999, Mr. Cooke returned to Liberia. He testified that he felt compelled to return to help his three children, who were staying with Mrs. Cooke's sister. After changing the last names of his children and making arrangements for them, Mr. Cooke entered the United States a final time on August 9, 1999. Mr. Cooke placed in the administrative record a letter dated August 13, 1999, allegedly signed by a filing clerk at the MOF. The letter advised Mr. Cooke that the Auditor General of Liberia had ordered Mr. Cooke arrested because of the government corruption that he exposed in 1998.

On March 29, 2006, the IJ issued a decision finding the Cookes removable as charged and denying their applications for asylum, withholding of removal, and CAT relief. Although the IJ found the Cookes' evidence credible, she determined that the incidents described by the Cookes did not rise to the level of persecution. Alternatively, the IJ determined that country conditions in Liberia had changed such

---

[2]Peter Cooke testified that he signed a document in his role as Deputy Commissioner of the MOF that would have provided Johnson-Sirleaf "a grant or some financial reimbursement from the U.N." Admin. R. at 382.

that the Cookes could not show a well-founded fear of future persecution if they were to return. The BIA affirmed the IJ's decision without issuing a separate opinion. The IJ's decision is therefore the final agency determination from which the Cookes appeal. See 8 C.F.R. § 1003.1(e)(4).

## II.

The INA gives the Attorney General discretion to grant asylum to any individual who is a "refugee." 8 U.S.C. § 1158(b)(1). A refugee is defined by the INA as an alien who is unwilling or unable to return to his or her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). An alien petitioning for asylum bears the burden of proving persecution or a well-founded fear of persecution on account of one of the enumerated factors. 8 C.F.R. § 208.13(a). "Persecution is the infliction or threat of death, torture, or injury to one's person or freedom, on account of [a protected characteristic]." Regalado-Garcia v. INS, 305 F.3d 784, 787 (8th Cir. 2002). "Low-level intimidation and harassment alone do not rise to the level of persecution." Makatengkeng v. Gonzales, 495 F.3d 876, 882 (8th Cir. 2007) (quotation marks and citation omitted). Proof of past persecution entitles an applicant to a presumption that he has a well-founded fear of future persecution on the same basis. 8 C.F.R. § 208.13(b)(1). In this situation, the burden shifts to the government to show that there has been a "fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution" on account of a protected characteristic, or that the "applicant could avoid future persecution by relocating to another" area of his native country and it would be reasonable for the applicant to do so. Id. § 208.13(b)(1)(i) & (ii).

We review the IJ's decision denying the Cookes' request for asylum for abuse of discretion. See Hassan v. Gonzales, 484 F.3d 513, 516 (8th Cir. 2007). In so doing, we consider questions of law de novo and accord substantial deference to the

agency's interpretations of the statutes and regulations it administers. See Bushira v. Gonzales, 442 F.3d 626, 630 (8th Cir. 2006). We review the IJ's factual findings under the substantial evidence standard and must uphold the IJ's decision if, based on the record as a whole, it is supported by "'reasonable, substantial, and probative evidence.'" Perinpanathan v. INS, 310 F.3d 594, 597 (8th Cir. 2002) (quoting Kratchmarov v. Heston, 172 F.3d 551, 554 (8th Cir. 1999)). We will not overturn the IJ's decision unless the Cookes demonstrate that "'the evidence was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution.'" Id. (quoting Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997)).

### III.

On appeal, the Cookes argue that the IJ erred when she determined that the Cookes did not meet their burden of proving that Mr. Cooke had suffered past persecution on account of a protected status.[3] The IJ determined that the testimony of the Cookes and other witnesses was credible. The IJ "believe[d]" that Mr. Cooke was harmed by Taylor's rebels in 1990 and arrested by Taylor's government in 1998. Admin. R. at 79. The IJ further believed that Taylor's rebels struck Mrs. Cooke on the back with a belt buckle in 1997. The IJ concluded, however, that "those incidents of harm" did not rise to the level of persecution. Id. The IJ reasoned that the Cookes let some time pass between the occurrence of the incidents and filing for asylum, which indicated that "those past incidents in Liberia were not that significant." Id. at 80.

Persecution is "a 'fluid concept,' . . . one this court has defined to include the threat of death, the threat or infliction of torture, and the threat or infliction of injury to one's person or one's liberty on account of a protected ground." Sholla v. Gonzales, 492 F.3d 946, 951 (8th Cir. 2007) (citation omitted). We have reviewed the entire record in this case and conclude that the evidence compels a finding of past

---

[3]Because Mrs. Cooke's claim for asylum and related relief derives entirely from Mr. Cooke's claim, we focus on Mr. Cooke's experiences. See Makatengkeng, 495 F.3d at 878 n.2.

persecution based on a protected status. Mr. Cooke was taken into custody, threatened with death, and beaten with the butts of rifles until he lost consciousness. This beating caused a permanent ridge in his head and long-term injuries, including chronic headaches and an enlarged vein on his forehead, that require continuing medical treatment. On another occasion, Mr. Cooke was arrested, interrogated, and imprisoned for at least two days. In a third incident, Mr. Cooke's wife was threatened and hit with a belt buckle in an attempt to learn her husband's whereabouts. Mr. Cooke's children were held at gunpoint. He was forced to change the names of his children in an effort to protect them. The undisputed evidence shows that these threats, beatings, and arrests were the result of Mr. Cooke's involvement in the Unity Party and his acts in opposition to Taylor's party, including the exposure of corruption by high-level officials of Taylor's party. Viewed together, these incidents fall within this Circuit's definition of persecution. See, e.g., id. at 952 (holding that placement in labor camp, death threats, beating, and firing bullets into home fall within the definition of persecution); Bah v. Gonzales, 448 F.3d 1019, 1023–24 (8th Cir. 2006) (holding that past persecution was established where Taylor's forces burned petitioner's home, threatened him with death, imprisoned him twice, and murdered his father); Corado v. Ashcroft, 384 F.3d 945, 947 (8th Cir. 2004) (per curiam) (ruling that credible evidence of a single threat of death on account of petitioner's political opinion could suffice to establish past persecution). Cf. Vonhm v. Gonzales, 454 F.3d 825, 828 (8th Cir. 2006) (holding that "two detentions by Taylor's security forces in which [petitioner] did not suffer physical injury other than a bruised shoulder did not establish conduct sufficiently severe to constitute past persecution").

We disagree with the IJ's reasoning that the abuse suffered by Mr. Cooke was rendered less "significant" by the fact that he did not seek asylum on an earlier trip to the United States. Admin. R. at 80. Mr. Cooke first traveled to the United States in May 1997. He testified that he did not apply for asylum at that time because his plan was to raise money during the trip in order to get his wife and children out of Liberia. His trip was cut short by the attack on his wife. After Mr. Cooke was arrested and

detained in August 1998 (and his wife had made it to the United States), he quickly set about making arrangements for travel to the United States, and he arrived here in October 1998. Although he returned to Liberia in March 1999, he testified that he was compelled to return to help his three minor children (who had told him on the telephone that armed men had been coming nightly to the house where they were staying) escape from Liberia. After taking steps to ensure the safety of his children, Mr. Cooke came to the United States and sought asylum. We find that the reasons given by Mr. Cooke for the delay in his asylum application were reasonable. In any event, given that the IJ found the Cookes' evidence of physical beatings, arrests, and interrogations credible, we fail to see how the filing delay could impact the severity of such persecution. See Ayi v. Gonzales, 460 F.3d 876, 881 (7th Cir. 2006) (holding that petitioner's failure to apply for asylum on his first visit to the United States was not relevant to the question of whether petitioner's testimony about the level of torture he endured was credible).[4]

After considering the record as a whole, we conclude that the evidence compels a finding that Mr. Cooke suffered past persecution on account of his political beliefs.

_____

[4]The IJ also based her decision on the timing of Mrs. Cooke's entry into the United States and on the fact that Mrs. Cooke has brothers who remain in Liberia unharmed. We note, again, that Mrs. Cooke's asylum claim is derivative of Mr. Cooke's asylum claim, making Mr. Cooke's actions the more relevant of the two. In any event, Mrs. Cooke gave a reasonable explanation for the timing of her entry into the United States. Mrs. Cooke was threatened and beaten in June 1997. Around that time, she applied for a passport, which was issued in February 1998. She then sought a United States visa, which was issued in May 1998. Mrs. Cooke came to the United States the next month. She explained that she could not have come to the United States sooner because she needed to save money for travel and make arrangements for her accommodations in the United States. As for the presence of Mrs. Cooke's brothers in Liberia, "[w]hile it is generally true that the presence and safety of family members in a country may suggest an absence of danger, . . . there is no evidence to suggest that [the brothers were] politically active or involved in activities likely to draw the ire of Charles Taylor supporters." Bah, 448 F.3d at 1021 n.2.

The IJ's contrary decision is not supported by reasonable, substantial, and probative evidence. The Cookes have satisfied their burden of showing that Mr. Cooke suffered past persecution, and Mr. Cooke was entitled to the presumption that he has a well-founded fear of future persecution. See 8 C.F.R. § 208.13(b)(1).

IV.

This conclusion does not end the matter, however. As we mentioned above, the presumption of a well-founded fear of future persecution can be overcome by a showing that there has been a fundamental change in circumstances such that the alien's fear of persecution upon return to his home country is no longer well-founded. The IJ, although erroneously finding no past persecution, went on to perform a changed-circumstances analysis. The IJ concluded:

> [E]ven if the respondents were to show that they had suffered past persecution based on one of the five grounds enumerated in the Act, this Court would find that the government has rebutted the presumption of future persecution by showing that there are changed country conditions in Liberia such that the respondents would no longer have a fear of future persecution based on one of the five grounds enumerated in the Act should they return to Liberia.

Admin. R. at 83. If the IJ's changed-circumstances analysis is sound, then the IJ did not abuse her discretion in denying the Cookes' applications for asylum.

The Cookes make two challenges to the IJ's finding of changed circumstances. First, the Cookes assert that the IJ did not properly shift the burden of proof to the government to rebut the presumption of a well-founded fear of future persecution. This argument is belied by the record. The IJ assumed that the presumption was in the Cookes' favor, but concluded that "the government has rebutted the presumption of future persecution by showing that there are changed country conditions in Liberia." Id. In reaching this conclusion, the IJ extensively cited the 2005

-10-

Department of State Country Report on Liberia, a copy of which was submitted by the government (as well as the Cookes). See Uli v. Mukasey, __ F.3d __ , 2008 WL 2777416, at *5 (8th Cir. July 18, 2008) (holding that by relying on evidence submitted by the government, the BIA implicitly shifted the burden to the government to rebut the presumption that the petitioner had a reasonable fear of future persecution).[5] Only then did the IJ shift the burden back to the Cookes to prove that they had a well-founded fear of future persecution. See Admin R. at 83–84. Placing the burden of proof on the Cookes at that point was proper. See Abrha v. Gonzales, 433 F.3d 1072, 1075 (8th Cir. 2006) ("This presumption may be rebutted, however, if the respondent shows by a preponderance of the evidence that there is no longer a reasonable fear of future persecution . . . in which case the burden reverts back to the alien.").

The Cookes' second argument is that the government failed to prove a fundamental change in country conditions in Liberia. To rebut the presumption that the Cookes had a well-founded fear of future persecution, the government had the burden of proving by a preponderance of the evidence that conditions in Liberia "have changed to such an extent that [Mr. Cooke] no longer has a well founded fear of being persecuted if [he] were to return." Uli, 2008 WL 2777416, at *5 (quotation marks and citation omitted). We conclude that substantial evidence supports the IJ's determination that there are "substantially changed country conditions from the time that [the Cookes] left Liberia." Admin. R. at 84.

Taylor resigned as the President of Liberia in August 2003 and fled the country. On the morning of the 2006 administrative hearing, Taylor was captured, and the IJ noted that he was to stand trial in The Hague for war crimes related to Sierra Leone's

---

[5]We further note that the entire focus of the government's closing argument at the administrative hearing in this case was on the "fundamental change in country conditions in Liberia." Admin. R. at 393.

1991–2001 civil war.[6] Johnson-Sirleaf, who is the head of the Cookes' political party, was elected President in 2005 (and remains in that position today). As noted by the IJ, the 2005 Department of State Country Report on Liberia indicates that Liberia established an independent national commission on human rights and a truth and reconciliation commission to investigate human rights violations and war crimes committed during Liberia's civil war. By the end of 2005, more than 25,000 disarmed and demobilized former combatants were required to enroll in reintegration programs. There were considerably fewer reports of human rights abuses by former combatants than in previous years. There were no reports that former rebel combatants arbitrarily arrested civilians. There were no reports that the government or its agents committed arbitrary or unlawful killings. There were no reports of politically motivated disappearances under the current government, as there had been during the civil war. There were, however, reports of police abuse and harassment, as well as arbitrary arrests by security forces (although less frequently than in previous years). Widespread government corruption remained, but a number of high-level officials were dismissed or suspended for corruption in 2005.

Mr. Cooke alleged that he feared returning to Liberia because there were elected officials in power who were Taylor supporters and who were responsible for the attacks that Mr. Cooke suffered in 1990 and 1998. Specifically, Mr. Cooke testified that Edwin Snowe, a former son-in-law of Taylor and a Taylor general who ordered Mr. Cooke's arrest, was the Speaker of the House of Representatives. And Abdel Massaley, a former general and leader in Taylor's government who Mr. Cooke claims is responsible for his 1990 beating, was the senior senator for the region where the Cookes resided. Mr. Cooke believes that these men would order his persecution or death because he exposed their corruption, as well as the corruption of the then-Deputy Minister of Revenue who was "one of Charles Taylor['s] men," when Mr. Cooke worked in the MOF. Admin. R. at 231. Before leaving Liberia, Mr. Cooke

---

[6]That trial is currently taking place.

-12-

revealed to the press that Snowe had stolen money from the government petroleum company. Mr. Cooke testified that another person who had helped him expose the government corruption had been killed. Dr. S. Momolu Getaweh, Sr., a professor at the University of Liberia and past-Secretary General of the Liberian National Bar Association, testified in support of Mr. Cooke's allegations. According to Dr. Getaweh, "Taylor's political influence in Liberia is still large. Those who fought for Taylor including the majority of his henchmen/women are still in power in Liberia. . . . Some of them are legislators, Cabinet ministers and members of the Judiciary." Id. at 479. Both Mr. Cooke and Dr. Getaweh testified, however, that they did not know of any instance in which Snowe had persecuted anyone since Taylor left office in August 2003. Similarly, Dr. Getaweh testified that he knew of no member of the Unity Party that had been persecuted since Taylor left office in 2003. There is no objective evidence in the record that anyone in the current Liberian government poses a threat to Mr. Cooke's safety.

Although the issue is a close one, we cannot find that the evidence compels a finding that the Cookes have an objectively well-founded fear of future persecution in Liberia based on a protected ground. See Redd v. Mukasey, __ F.3d __, 2008 WL 2889369, at *5 (8th Cir. July 29, 2008) (holding that substantial evidence supported the IJ's finding of changed circumstances in Liberia because Taylor has been removed from power and is on trial for war crimes, and petitioner presented no evidence to demonstrate that, beyond general strife, it would be dangerous for him to return to Liberia); Vonhm, 454 F.3d at 828 (holding that Liberian petitioner did not have a well-founded fear of future persecution because Taylor is no longer in power, civil war has ended, and there was no evidence that current government had a reason to persecute petitioner). We therefore must uphold the IJ's determination that the Cookes are not eligible for asylum.

## V.

Finally, the Cookes assert that the IJ erred in denying their claims for withholding of removal and relief under the CAT. The standards of proof for withholding of removal and relief under the CAT are more stringent than the standard for asylum. See Madjakpor v. Gonzales, 406 F.3d 1040, 1044 (8th Cir. 2005) (ruling that withholding of removal shall be granted if an alien proves "that it is more likely than not that he will be persecuted if returned to the country of removal"); 8 C.F.R. § 208.16(c)(2) (stating that CAT relief is available if an alien proves "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal"). As the Cookes presented the same factual basis for all three claims and failed to meet the least demanding burden of proof for the asylum claim, their claims for withholding of removal and protection under the CAT likewise fail. See Alemu v. Gonzales, 403 F.3d 572, 576 (8th Cir. 2005); Kimumwe v. Gonzales, 431 F.3d 319, 323 (8th Cir. 2005).

## VI.

For the reasons stated above, we deny the petition for review.

_____

-14-