# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 08-3304

_____

James Kinyanjui Gitimu; Florence    *
Wangori Mugi; Samuel Gitimu       *
Kinyanjui,       *
      *
    Petitioners,       *
      *     Petition for Review of an
   v.       *     Order of the Board of
      *     Immigration Appeals.
Eric H. Holder, Jr., Attorney       *
General of the United States,[1]       *     [PUBLISHED]
      *
    Respondent.       *


_____

Submitted: June 9, 2009
Filed: September 22, 2009

_____

Before BYE, HANSEN, and BENTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

James Kinyanjui Gitimu, his wife Florence Wangori Mugi, and their child Samuel Gitimu Kinyanjui (Petitioners), petition for review of the Board of

_____

[1]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Eric H. Holder, Jr. is automatically substituted for former Attorney General Michael B. Mukasey as the respondent in this case.

Immigration Appeals' (BIA) order denying them asylum, withholding of removal, and relief under the Convention Against Torture (CAT). We deny the petition.

## I.

The Petitioners are natives and citizens of Kenya who were admitted into the United States as nonimmigrant visitors in September 2001, with permission to remain in the United States until March 27, 2002. The Petitioners remained in the United States longer than permitted and, in August 2002, applied for asylum. Removal proceedings commenced in October 2002. The Petitioners conceded removability but requested asylum, withholding of removal, and relief under the CAT. Their requests were based on assertions of past persecution and a well-founded fear of future persecution, both due to James's political affiliations and activism. At a hearing before an immigration judge (IJ) on May 24, 2007, James and Florence both testified regarding hardships they suffered in Kenya prior to arriving in the United States.

James testified that after obtaining a college education in India he returned to Kenya and started a secondhand clothing business in 1988. In 1992, he joined the Democratic Party of Kenya. Then, in 1993, his clothing business was destroyed by an early morning fire that James believes to have been arson. After his business was destroyed, he earned a living overseeing a farm owned by various family members. During this time, James was also involved in a political group advocating the release of political prisoners in Kenya. His cousin was a prisoner, and James would demonstrate outside the jail.

In July 1993, James participated in a political rally of 10,000 to 20,000 people, representing multiple opposition political parties. Police descended on the rally, fired tear gas, and wielded clubs to disperse the rally participants. James estimates 1,000 people were arrested, and he was among them. Police held him for one month and gave him no food for the first two days.

In September 2000, James's brother died in India and was buried in Kenya. According to custom, Kenyans often give money to the surviving family members of the deceased. Shortly after the brother was buried, approximately ten masked men arrived at the family home demanding money. When the family told them there was no money, the men exhumed the brother's body, brought it to the family home, and demanded money for its safe return. When the family again told the masked men there was no money, the men left the body and the family interred it a second time. James testified that he believes the masked men were motivated by the customary funeral donations.

Less than a year later, in July of 2001, another group of masked men arrived at the family home. The men broke a window in James's mother's bedroom and entered the house through the broken window. When James answered his mother's screams for help, the men threw rocks at him and began to beat him. The men told James that a politician sent them to kill him and his family. The intruders did not reveal the name of their political boss. When the men began assaulting James, his wife Florence interceded and begged the men not to kill her husband. Having drawn the intruders' ire, Florence was brutally sexually assaulted by each of the men.

Florence also testified before the IJ. She recounted how she begged the men not to kill her husband and was then sexually assaulted by each of the men. She remembers the men saying they were there to punish her husband for his political involvement.

Neither James nor Florence could identify the masked men—either by name or as members of a particular political or social group. The men were not wearing uniforms but looked like regular Kenyans. After the incident, the family alerted the police, Florence underwent a documented medical examination, and a police report was completed. The police report makes no mention of the intruders' political motivations.

Two United States State Department documents were also admitted into the record before the IJ. One of those documents, the 2006 Country Report on Human Rights Practices for Kenya (the country report), indicates "no reports that the government or its agents committed politically motivated killings" in 2006. (Pet'rs' App. at 348.) There were also no reports of political prisoners or detainees. The report details instances of mob violence in the form of vigilante justice, but the great majority of the victims of mob violence were suspected of criminal activity. The report notes freedom of speech and assembly are guaranteed by Kenya's constitution, and there was a diminishing number of reports that the government restricted the right to assemble in 2006. According to the report, Kenyan law also protects the rights of workers to join labor unions. Approximately 600,000 workers exercised that right, and there were no reports of human rights abuses of labor union leaders in 2006.

The IJ found the hardships suffered by the Petitioners were acts of crime—not motivated by politics—and therefore did not amount to past persecution. The IJ also found, in the alternative, that the Petitioners do not have a well-founded fear of future persecution because the political party in which James claims membership controlled the presidency of Kenya at the time of the hearing. Additionally, the IJ found the Petitioners could relocate within Kenya and avoid future persecution. As a result, the IJ denied the Petitioners' application for asylum. The IJ also denied the Petitioners' requests for withholding of removal and relief under the CAT because those forms of relief must meet more demanding burdens of proof of future persecution than an asylum claim. The BIA adopted the IJ's decision and affirmed. The Petitioners now seek review of the BIA's order adopting and affirming the decision of the IJ.

II.

"Any alien who is physically present in the United States . . . may apply for asylum . . . ." 8 U.S.C. § 1158(a)(1). To qualify for asylum, an alien shoulders the burden of establishing he is a refugee, as that term is defined in 8 U.S.C. §

1101(a)(42).  Id. § 1158(b)(1).  Under § 1101(a)(42)(A), a refugee includes "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group, or political opinion . . . ."  Thus, an alien petitioning for asylum must prove past persecution or a well-founded fear of future persecution due to one of the bases enumerated in the statute.  8 C.F.R. § 1208.13(a).  Even where past persecution is shown, an immigration judge must deny asylum when a preponderance of the evidence shows "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality . . . ."  Id. § 1208.13(b)(1)(i)(A).

The BIA affirmed the IJ's findings that the Petitioners did not suffer past persecution and, due to changed circumstances in Kenya, do not suffer a well-founded fear of future persecution.  The Petitioners challenge those findings.  "Where the BIA adopts the IJ's reasoning, we review the IJ's decision as well."  Banat v. Holder, 557 F.3d 886, 889 (8th Cir. 2009).  We review the IJ's decision denying the Petitioners' request for asylum for abuse of discretion.  Cooke v. Mukasey, 538 F.3d 899, 904 (8th Cir. 2008).  We analyze questions of law *de novo*, according "substantial deference to the agency's interpretations of the statutes and regulations it administers."  Id.  The IJ's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).  Thus, to reverse the IJ's findings related to past and future persecution we would have to hold that the evidence presented by the Petitioners was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution."  I.N.S. v. Elias-Zacarias, 502 U.S. 478, 484 (1992).

III.

The Petitioners advance two challenges to the IJ's finding that they did not suffer past persecution on account of political opinion or membership in a particular social group. First, the Petitioners argue the record evidence compelled a finding of past persecution. They argue that, in the absence of an explicit adverse credibility determination, James's and Florence's testimony and supporting documentary evidence would lead any reasonable factfinder to determine the home invasion was politically motivated. The Petitioners also advance a separate legal argument related to the claimed past persecution—they claim the IJ erroneously required further substantiation of the Petitioners' testimonial assertions supporting the claim of past persecution.

At the same time, the Petitioners argue the evidence would compel any reasonable adjudicator to find they have a well-founded fear of future persecution should they return to Kenya. They argue the country report does not support the IJ's finding of changed circumstances but actually demonstrates the reasonableness of their fear of future persecution. In a related argument, the Petitioners claim their constitutional right to due process was violated to the extent the IJ took administrative notice of changed country conditions in Kenya without providing the Petitioners advance notice of, and an opportunity to respond to, his reliance on administrative notice to make factual findings.

Although the IJ found no past persecution, he alternatively held that changed circumstances—including the fact that the leader of James's political party controlled the presidency of Kenya—meant the Petitioners could not have a well-founded fear of future persecution. Even where there is a finding of past persecution—and the resulting presumption of a well-founded fear of future persecution, 8 C.F.R. § 1208.13(b)(1)—an alien is not entitled to asylum when the government shows by a preponderance of the evidence that "[t]here has been a fundamental change in

-6-

circumstances such that the applicant no longer has a well-founded fear of persecution . . . ." Id. § 1208.13(b)(1)(i); see also Cooke, 538 F.3d at 906-08 (noting a finding of past persecution "does not end the matter" and affirming IJ's denial of asylum based on factual finding that petitioners had no well-founded fear of future persecution). The IJ made precisely such a finding in this case. Thus, even if we assume that the Petitioners suffered past persecution, we cannot interfere with the IJ's order if the record provides sufficient support for the IJ's factual finding that changed country conditions mean the Petitioners do not have a well-founded fear of future persecution.[2]

State Department country reports can support a factual finding of changed conditions to rebut a presumption of a well-founded fear of future persecution. See, e.g., Uli v. Mukasey, 533 F.3d 950, 957 (8th Cir. 2008) (noting evidence of changed circumstances in country reports and concluding "the record evidence does not compel a reversal"). Use of country reports cannot substitute for an analysis of the unique facts of each applicant's case. Yang v. Gonzales, 427 F.3d 1117, 1121 (8th Cir. 2005). In this case, the IJ considered the country report as part of an analysis of the Petitioners' individual circumstances. Ultimately, the IJ found that the preponderance of the evidence showed no well-founded fear of future persecution. We cannot say the evidence compels a contrary finding. See 8 U.S.C. § 1252(b)(4)(B) ("administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary").

The country report notes that Kenya is a republic dominated by a strong presidency. The country report also relates that the people of Kenya elected a former opposition leader, Mwai Kibaki, as president in 2002. As James testified at the hearing before the IJ, Mr. Kibaki leads the political party in which James claims membership. The country report also states that there were no reported politically

---

[2]The same principle applies to the other legal issue related to past persecution: whether the IJ erred by requiring additional substantiation.

motivated killings in Kenya in 2006. Although there were incidences of mob violence, the violence usually consisted of vigilante acts against suspected criminals. Further, the State Department recorded no reports of political prisoners or detainees. There were fewer reports of government restriction of the constitutionally mandated freedom of assembly. The country report also notes a legal right for workers to join labor unions, a right exercised by approximately 600,000 workers. Despite the level of union membership, "[t]here were no human rights abuses of union leaders reported by the government." (Pet'rs' App. at 367.) Finally, the country report does not suggest the existence of discrimination against members of James's political party or proponents of farmers' rights.

Apart from the country report, the IJ's finding is supported by testimony at the hearing. James testified he has numerous family members living in Kenya who have not suffered persecution. See Alyas v. Gonzales, 419 F.3d 756, 761 (8th Cir. 2005) (noting that an alien's fear of future persecution is diminished when the alien's family members continue to reside unharmed in the alien's native country). Additionally, both James and Florence testified they do not know the identity of the assailants in either the 2000 or 2001 incidents. See Menendez-Donis v. Ashcroft, 360 F.3d 915, 919 (8th Cir. 2004) (analyzing a record lacking "clear evidence as to the identity of [alien's] attackers" and concluding the record supported a factual finding of lack of well-founded fear of future persecution). Based on the record as a whole, we cannot say no reasonable factfinder would agree with the IJ. While a different factfinder may have reasonably found in the Petitioners' favor, that is not enough to require reversal of the IJ. The record evidence does not compel a reversal of the IJ's decision to deny asylum.

The Petitioners also argue their due process rights were violated because the IJ took administrative notice of changed country conditions. In this case, the IJ's factual findings regarding country conditions were explicitly based on the country report. The country report was part of the record, and the Petitioners had ample opportunity

-8-

to rebut that evidence before the IJ and the BIA. The Petitioners' due process rights were not violated.

Where the asylum seekers fail to establish eligibility for asylum, as the Petitioners do in this case, "they necessarily cannot meet the more rigorous standard of proof for withholding of removal." Khrystotodorov v. Mukasey, 551 F.3d 775, 784 (8th Cir. 2008). The Petitioners' request for relief under the CAT suffers the same fate because it is based on the same factual basis and must likewise meet a more demanding burden of proof than their asylum claim. Cooke, 538 F.3d at 908.

IV.

Accordingly, we affirm the BIA order adopting and affirming the decision of the IJ and deny the petition for review.

_____