# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-1060

_____

Andrea Wences Godinez; Kelly Michell Wences Godinez, also known as Kelly
Michelle Wences Godinez; Caleb Moises Wences Godinez; Victorina Godines
Alarcon, also known as Victorina Godinez Alarcon

*Petitioner*s

v.

William P. Barr, Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: January 15, 2019
Filed: July 8, 2019

_____

Before BENTON, MELLOY, and KELLY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Petitioner Andrea Wences Godinez ("Andrea") and two of her children, Kelly
and Caleb, along with Andrea's mother, Victorina Godines Alarcon ("Victorina"),
appeal the Board of Immigration Appeals' (BIA) denial of asylum and withholding
of removal. The BIA determined as a factual matter that the Petitioners did not

experience past persecution or face the requisite risk of future persecution on account of a protected basis. Specifically, Andrea did not belong to the asserted "particular social group" of "women who are in abusive relationships in Mexico that they can't leave," and Victorina was not persecuted on account of her familial relationship with Andrea. The BIA also determined Petitioners could relocate within their home country. Because the record does not compel reversal of the BIA's factual determinations, we affirm.

I.

Petitioners are natives and citizens of Mexico. On November 25, 2015, Andrea, Victorina, Kelly, and Caleb were apprehended at a port of entry between the United States and Mexico. They later conceded removability and sought asylum and withholding of removal based on the following facts as asserted in testimony and written declarations.

Andrea had been in a relationship with a man named Jose. They lived together for seven months in 2010 at a location several hours away from Andrea's hometown. Andrea became pregnant then fell ill during her pregnancy. She felt she was an unwelcome financial burden to Jose's family. As a result, Andrea left Jose and returned to her hometown to live with her mother, Victorina. Kelly was born in March 2011.

In May 2011, Andrea left for Tijuana to find work. There, she met a man named Diego and moved in with him. She discovered she was pregnant in October 2013. During the pregnancy, Diego hit her in the head and pushed her. She called the police, but in response to Diego's begging, she did not speak to officers who responded. Later, Diego slapped her. Subsequently, Diego locked Andrea in the house, would not let her leave, and repeatedly raped her. Andrea eventually escaped, walked to a friend's house, and called the police. The police did not take action

against Diego. Eventually she was able to obtain assistance with travel and reach her mother's home.

Jose had not attempted to contact Andrea after she left him and moved to Tijuana. In 2014, however, they renewed their relationship. Jose moved into Victorina's home with Andrea while Andrea was still pregnant with Diego's child, Caleb. After Andrea gave birth to Caleb, Jose deceived Andrea regarding the use of birth control, and Andrea again became pregnant. Jose and Andrea's relationship soured, she began to distrust him, and they started arguing. Eventually, she demanded that he leave the house, at which time he claimed that he worked for a drug dealer without saying specifically what work he performed. Andrea heard rumors that the drug dealer was also involved in murder for hire. Andrea did not know if Jose's statements were true. She believed Jose might have claimed a connection to the drug dealer as a means of frightening her so she would not end their relationship.

On November 7, 2015, Andrea and Jose argued in the morning. He eventually left, but returned at around one o'clock the following morning, entering the house loudly and threatening the family with a pistol. He pointed the gun at Andrea, Victorina, and the children and threatened to kill all of them. The encounter lasted four hours, after which time, Jose said he would not kill Andrea while she was pregnant. He eventually gathered his belongings and left but threatened to return to kill Andrea and take his child after the child's birth. Andrea and Victorina reported the incident to the police and filed a report, but the police refused to act on the report.

A period of weeks after Jose threatened them with the gun, the family left for the United States. In the weeks between the violent encounter and the family's exodus, Jose did not issue additional threats. Andrea reported, however, that he passed by her home once. Andrea testified that, after she arrived in the United States, her uncle obtained a copy of the police report, but Jose threatened to harm her uncle if he disclosed the report.

At some point after Petitioners entered the United States, Jose sent Andrea a friend request on Facebook. Andrea rejected the request. In addition, Diego's sister contacted Andrea through Facebook to ask if a picture Andrea had posted was Caleb, Diego's son. Eventually, Diego found Andrea's number and called, asking if Caleb was his son. Andrea told him to quit calling her and refused to answer future calls. Andrea testified that Diego had not attempted to contact her after she left Tijuana and before he called her in the United States. Finally, Andrea testified that she no longer fears future harm from Diego.

Based on the foregoing, an immigration judge (IJ) found Andrea and Victorina credible but reached several conclusions adverse to their applications. The IJ relied on Andrea's concession that she no longer feared harm from Diego to find that Andrea did not face a risk of future violence from Diego. Regarding Jose, the IJ found the one incident of violence did not amount to past persecution and also found Andrea failed to carry her burden of proving a fear of future persecution in light of: (1) the relatively short duration of her two different relationships with Jose; (2) the fact that Jose did not seek her out in her hometown or in Tijuana between those relationships; and (3) Andrea's failure to prove it would be unreasonable to relocate elsewhere within Mexico.

The IJ also addressed the state of the law regarding whether women trapped in abusive domestic relationships may be considered a cognizable social group. The IJ concluded Andrea failed to meet her burden to establish that such a group was recognized, in the society in question, as a discrete class of persons. The IJ also held, as a factual conclusion, that even if such a group were recognized, Andrea did not prove she was a member of the group because she failed to show she was unable to leave her relationships.

Finally, Victorina asserted as her protected social group her kinship and ties to Andrea. The IJ held that even if such a group were recognized, Victorina failed to

show a nexus between membership in this group and her alleged fear of Jose. In particular, the IJ concluded, "There is no evidence suggesting that Jose repeatedly threatened Victorina or otherwise targeted her for harm because of her familial relationship with Andrea. To the contrary, she happened to be in the house when Jose returned and threatened them all."

The BIA affirmed, noting Andrea "has shown her ability to leave her abusive relationships, and she is, therefore, not a member of the alleged particular social group." Regarding Victorina, the BIA found "no clear error in the Immigration Judge's determination that the mother's familial relationship with the daughter was not one central reason for Jose's actions against her, and that the mother was threatened only because 'she happened to be in the house when Jose returned.'" Finally, the BIA agreed with the Immigration Judge that "the record demonstrates that it is reasonable for the respondents to relocate within Mexico."

## II.

We review the BIA's final agency decision under the "deferential 'substantial evidence' standard." Njong v. Whitaker, 911 F.3d 919, 922 (8th Cir. 2018) (citation omitted). We review the IJ's decision to the extent the BIA adopted the IJ's findings and reasoning. Id. Pursuant to the "substantial evidence" standard, "we must affirm the BIA's factual decisions unless, after having reviewed the record as a whole, we determine that it would not be possible for a reasonable fact-finder to adopt the BIA's position." Id. at 922–23 (citation omitted).

To establish eligibility for asylum, a petitioner must demonstrate "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Gomez-Garcia v. Sessions, 861 F.3d 730, 733 (8th Cir. 2017) (quoting 8 U.S.C. § 1101(a)(42)(A)). In reviewing Petitioners' claims for relief, we must pay "careful attention to the

particular circumstances surrounding the alleged persecution." Id. at 734 (quoting Marroquin-Ochoma v. Holder, 574 F.3d 574, 577 (8th Cir. 2009)).

Here, Petitioners rely primarily on an agency decision in which the BIA recognized "married women in Guatemala who are unable to leave their relationship" as a particular social group. Matter of A-R-C-G-, 26 I&N Dec. 388, 389 (BIA 2014). In particular, Petitioners argue, "The Board's analysis [in the present case] turns the particular social group in [Matter of A-R-C-G-] on its head. If the 'inability to leave' requirement meant anyone who has actually left (by coming to the United States) isn't a member, then nobody applying for asylum would ever be a member of that group." The government counters that recent guidance from the Attorney General overrules Matter of A-R-C-G-. See Matter of A-B-, 27 I. & N. Dec. 316, 319 (A.G. 2018). The government also argues the record supports the BIA's conclusion that Andrea was not a member of the proposed group.

We need not address the difficult questions raised by Matter of A-R-C-G- and Matter of A-B- in the present case because Petitioners simply misconstrue the BIA's findings. Here, the BIA did not find, as a factual matter, that Andrea was not a member of the asserted group simply due to her ability to reach the United States. Rather, the BIA determined Andrea left Jose once for a period of years and he did not attempt to contact her. When they renewed their relationship, they were together for months before the night of his violent threats with a gun. Then, Andrea and her mother and children remained at their home for weeks without incident before leaving for the United States. And, substantial evidence supports the conclusion that Andrea did not have a well-founded fear of future persecution at Diego's or Jose's hands. Although Diego had repeatedly abused Andrea in Tijuana, he did not attempt to reach her throughout 2014 and 2015 after she left Tijuana and returned to her hometown. Moreover, neither man's attempts to contact Andrea in the United States involved threats, and Andrea herself admits she no longer fears Diego. Finally, the arguably heightened danger associated with Jose's possible connection to a violent drug

dealer's network of associates is speculative. Andrea herself was equivocal as to whether such a connection actually existed. The record simply does not compel the conclusions that the BIA misconstrued these facts or that Andrea met her burden of proving past persecution or a well-founded fear of future persecution based on a protected status. See Karim v. Holder, 596 F.3d 893, 897 (8th Cir. 2010) ("We will not overturn the agency's decision unless . . . the evidence . . . is so compelling 'that no reasonable fact finder could fail to find the requisite fear of persecution.'" (quoting Cooke v. Mukasey, 538 F.3d 899, 904 (8th Cir. 2008))).

Regarding Victorina's own claims, the BIA permissibly determined that Jose's threat against her was due to her presence on the night of the violent encounter rather than her familial relationship with Andrea. Id. Victorina cites no other incidents of threats or violence from Jose against herself, and she does not claim to have had any interactions with Diego.

Finally, "[w]ithholding of removal requires an even greater showing" than asylum. Lopez–Amador v. Holder, 649 F.3d 880, 884 (8th Cir. 2011). "To obtain withholding of removal, an alien must demonstrate a clear probability—i.e., that it is more likely than not—that [s]he would suffer persecution on account of a protected ground." Karim, 596 F.3d at 897. As such, "an alien who fails to prove eligibility for asylum cannot meet the burden for withholding of removal." Id. The BIA did not err in denying withholding of removal.

III.

We deny the petition for review.

_____