# United States Court of Appeals
## For the First Circuit

No. 06-1481

VANNARETH CHRENG,

Petitioner,

v.

ALBERTO R. GONZÁLES, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, <u>Chief Judge</u>,

Campbell, <u>Senior Circuit Judge</u>,

and Lipez, <u>Circuit Judge</u>.

<u>Martin J. McNulty</u> on brief for petitioner.
<u>Aixa Maldonado-Quiñones</u>, Assistant United States Attorney, and
<u>Thomas P. Colantuono</u>, United States Attorney, on brief for
respondent.

December 19, 2006

**CAMPBELL**, <u>**Senior Circuit Judge**</u>.  Vannareth Chreng petitions for review of an order by the Board of Immigration Appeals ("BIA" or "Board") dismissing his appeal from an immigration judge's ("IJ") denial of his applications for asylum and withholding of removal, and ordering his removal to Cambodia.[1]

## I.  Background

A Cambodian national, Chreng applied for asylum, withholding of removal and relief under the CAT, <u>see</u> <u>supra</u> note 1, on January 15, 2002.  On November 19, 2004, he appeared before an IJ, and a removal hearing was held, during which he and the government submitted evidence.  On November 19, 2004, the IJ orally announced a decision, later transcribed, ordering Chreng's removal to Cambodia.  Chreng appealed to the BIA.  On February 21, 2006, the BIA issued a per curiam order adopting and affirming the decision of the IJ and dismissing the appeal.  The BIA rejected Chreng's motion to remand.  This petition followed.

## II.  The Hearing and the IJ's Decision

<u>A.  Evidence Presented</u>

Chreng was the only witness to testify at his removal hearing.  Additionally, he submitted documentary evidence, including a copy of his I-589 form, certain internet background

---

[1]Chreng's further claim for relief under the Convention Against Torture ("CAT") was also denied; but as he does not address that claim in this petition for review, it is waived.  <u>See</u> <u>Frazier</u> v. <u>Bailey</u>, 957 F.2d 920, 932 (1st Cir. 1992) (arguments not fully presented in appellate brief are waived).

-2-

information, including a 2004 statement from Madeleine Albright, newspaper clippings and public statements from the Sam Rainsy political party, to which he allegedly belonged. The government's evidence consisted of the 2003 Department of State Cambodia conditions report indicating improved political conditions there.

Chreng told the IJ that he was a 49-year-old male who came to the United States on January 24, 2001. Married on November 27, 1986, he left behind his wife and three children ages 19, 17, and 12. He was born on January 3, 1957 and was thus about 18 years old at the time that Pol Pot took control of Cambodia. His father and mother, uncle, and two older brothers were sent to "high Angka," which he said meant they had been murdered. In March of 1979, Chreng joined the Molinaka political party, which opposed Hun Sen, the Prime Minister of Cambodia and a key leader of the Cambodian People's Party. Because of his opposition to Hun Sen, Chreng said, he was arrested by Vietnamese agents on December 26, 1979 and sent to prison at Trapeang Thlong for a period of five years. In March 1988, he was arrested once again and sent to fight the Khmer Rouge guerillas at the Thailand border.

Chreng said that his first job was for the United Nations Transitional Authority in Cambodia ("UNTAC") from 1991-1993. He was in charge of helping people register to vote. Chreng monitored voters in order to determine whether they were true Cambodians. He opposed allowing Vietnamese immigrants to register to vote in the

Cambodian elections since he believed that letting the Vietnamese vote had ensured the victory of the Khmer Rouge. Chreng testified that an individual named Sok May threatened him at this time because he opposed petitioner's ideas as to who should vote. Sok May only threatened but never attacked petitioner.

Chreng further testified that on January 2, 1991, when he left the polls to pick up his motorcycle, Sok May told him that he would be killed if he continued to prevent people from voting. On cross-examination, Chreng stated that Sok May had threatened him on November 30, 1991.

In 1991, Chreng became a member of the National United Front For a Neutral, Peaceful Cooperative and Independent Cambodia (hereinafter "FUNCINPEC") political party. His involvement in the party included assisting in the recruiting of members, creating flyers and banners, posting pictures and explaining the party's principles. Chreng testified that the party advocated an end to violence, assistance for Khmer women, finding justice, protecting the country's territory, improving immigration laws, eradicating corruption, and changing laws.

On May 23, 1993, Prince Norodom Ranariddh, President of the FUNCINPEC, won the Cambodian elections. Petitioner had spent three months campaigning for FUNCINPEC, including Sundays and holidays. He initially testified that in May 1993, Sok May had grabbed him by the collar. But when it was pointed out to Chreng

-4-

that he had testified previously that Sok May had threatened him in January of 1991, Chreng revised his testimony to say that it was two unknown individuals who had grabbed his collar and punched him while he stood by his motorcycle. On re-direct, Chreng testified that this incident took place in May 1993, and that Sok May was not involved. Chreng told the IJ that he did not know these two individuals, who were wearing dark glasses. One grabbed him by the collar and punched him in the face. Thereafter, Chreng could not see anything. The other individual grabbed him by the shoulder, threatened him, and told him to allow Vietnamese to register for the election, otherwise he would be killed. After that, they disappeared. While Chreng could not identify them, he thought that only members of the People's Party would slap him in the face.

After the 1993 elections, Chreng worked as a staff member for the post office at the Ponchentong airport receiving packages and letters. Ten of his colleagues at work belonged to Hun Sen's People's Party, whereas five belonged to the FUNCINPEC Party. Chreng testified that he had problems with the members of the People's Party because they would take the customers' packages and letters.

On July 5 and 6, 1997, while Chreng was still working for the post office, Hun Sen and his followers conducted a coup. Hun Sen had ceased to be willing to share power with Prince Ranariddh. During the coup, Chreng was separated from his family and went into

-5-

hiding until the shooting subsided. He stayed in a water tunnel for two days and then hid in a jungle when things calmed down. His wife, with whom the children had been living, remained at their address given in his I-589 form. Chreng hid for five months, from July to December 1997, in the Kampong Speu Province of Cambodia. He did not return to Phnom Penh until December 1997 because he feared being killed by Hun Sen's party, which had tried to kill FUNCINPEC party members.

Upon returning to Phnom Penh, Chreng joined the Sam Rainsy political party. That party's goals were to eradicate corruption, promote freedom and strive towards true democracy. Although never a candidate for political office himself, Chreng campaigned for Rainsy and urged people to vote for him. After the 1997 election, Chreng personally advised Rainsy on political matters, meeting with Rainsy every Monday at party headquarters from January 1998 to 2000. On July 26, 1998, Cambodia held a second national election. For three months prior to the election, Chreng campaigned every day in Kampon Speu, lifting banners, posting pictures and promoting the party's vote among the people. His campaign activities led to some problems. On the morning of April 6, 1998, Chreng found an anonymous letter at the front door of his house telling him to stop supporting Sam Rainsy's party or he would be killed.

When Hun Sen won the second election, some people, including Chreng, protested, claiming that Hun Sen had won the elections by fraud. On September 8, 1998, around 10,000 dissidents gathered in front of the Wat Boton Temple. The demonstrators, including petitioner, who held a microphone, walked in a line toward the Independence Building. Once at the building, Hun Sen's soldiers blocked the demonstrators and impeded them from proceeding forward. Chreng testified that three soldiers approached him and one hit him on the left shoulder with a black stick so hard that he fell. Another soldier snatched the microphone from him, while a third hit and kicked him. Chreng stated he did not suffer broken bones, but a wound on his leg became infected. Chreng did not seek medical attention for his injuries but rather applied traditional medicine. He claimed that he did not see a doctor because he would have been killed since most of them belong to Hun Sen's party. Chreng stated that after being kicked, he was also photographed. When the other demonstrators moved forward, petitioner used the opportunity to escape and went to a stadium where he rested until the following day.

On September 9, 1998, the demonstrators moved from the Independence Building towards the American Embassy where they appealed for a change in the electoral laws. From there, they walked towards the Cambodian Parliament, but, before they reached the Parliament, they again encountered Hun Sen soldiers with water

vehicles blocking their way. As they tried to move forward, the soldiers shot water at them in an effort to disperse the crowd. Chreng testified that some people died and that when he escaped and went home, he saw that the situation was bad. He was not injured during the demonstrations. From September 9, 1998 to June 2000, he was not employed because there was no work for Sam Rainsy party people. Instead, he survived on his wife's "merchant" income.

Chreng testified that in June 2000, members of the Sam Rainsy party gathered in front of a tomb built in remembrance of those who had died "For the Cause of Justice." During the ceremony, petitioner gave a speech on why those commemorated had perished and blamed the adherents of Hun Sen. On his way home, he was surreptitiously followed, then placed under arrest and imprisoned for three days. While Chreng was not harmed in any way when in detention, the police superintendent told him at the time to stop supporting Sam Rainsy's party.

On November 23, 2000, according to Chreng, Hun Sen was planning a coup in front of the Department of Defense in order to get rid of the Sam Rainsy party. On the following day, Chreng attended a party meeting at the Cambodian Hotel. Suddenly, Chreng's son ran in to tell him that three police officers had come to their home to arrest him. According to his son, the officers had also threatened to kill his wife if she did not reveal his whereabouts, so his wife had asked that petitioner not return to

the house.  At the end of the day, he hid in the jungle.  He testified that thereafter, his life changed.  He believed that spies were following him everywhere he went.  He testified that people who had been arrested on November 23, 2000 all belonged to the Sam Rainsy party and that ten of them had been killed, while approximately 50 innocent people had been imprisoned.  When confronted with his own documentation, which stated that people arrested were members of the Cambodian freedom fighters, Chreng responded that Hun Sen fabricated that story in order to get rid of Sam Rainsy party members.

Chreng came to the United States on January 24, 2001, on a visitor's visa he had applied for at the American Embassy.  Although Cambodian officials were said to be looking for him on November 24, 2000, he was able to get to the Embassy on November 30, 2000.  He also obtained a passport on November 22, 2000 because he was afraid he would be imprisoned.  Chreng explained that he remained in Cambodia for so long after November 24, 2000 because he was waiting for things to calm down, in spite of the fact that he was hiding.  He testified that if he should now return to Cambodia, he would be killed.  In his application, he alleged that he could no longer live in Cambodia because he was afraid of Hun Sen's followers.  He also said he was afraid for his wife and children, not knowing where they were.

During the hearing, petitioner submitted four public statements made by the Sam Rainsy party denouncing certain acts of violence taking place in Cambodia. Statements dated June and October 2004, respectively, denounced a recent attempt by two unknown motorcyclists on the life of a member of the Sam Rainsy Steering Committee and chair of the council for the province of Oddor Menchley, and a separate grenade-throwing incident by unknown individuals, in which an active party member and two of his children were injured. Chreng also submitted a July 2004 letter from Madeleine Albright and statements from Senate Majority Leader Bill Frist condemning statements allegedly made by Hun Sen that were meant to intimidate the opposition. Chreng also submitted newspaper articles relating to events taking place from 1997 to 2001.

The government's evidence at the hearing consisted of the State Department's then most recent (2003) country conditions report on Cambodia, to which the petitioner made no objection. According to the report, there had been in the period of the report no politically motivated disappearances; no reports of political prisoners; greater media access for political parties and candidates; a general governmental respect for the right to associate; an ability for political parties to conduct their activities freely without government interference; a decline in political violence surrounding the July 2003 National Assembly

-10-

elections; a smooth transfer of power to newly elected commune councilors; no government coercion or prohibition in respect to membership in political organizations; and a need for all three major political parties to work together towards a new coalition, as no had party won the required majority to form a government.

B.  IJ's Decision

On November 19, 2004, the IJ issued an oral decision denying petitioner any relief.  While finding that petitioner's testimony about his experiences in Cambodia was generally credible, the IJ stated he needed to consider whether the facts, as related by respondent Chreng, satisfied the elements in the definition of "refugee."  The first question was "whether or not the events described by the respondent amount to past persecution."  Although finding that the petitioner had run into violent or potentially violent situations in connection with his political activities, the IJ held that petitioner's involvement in the September 8 and 9, 1998 demonstrations did not show persecution, as the violence was not directed at him personally for the purpose of changing his political beliefs or punishing him.  Rather, the police were acting to break up a demonstration and regain public order.

However, Chreng also described being arrested at his home following a speech in support of his political party and being detained for three days.  In addition, Chreng described a police search for him for the purpose of arresting him "for what can only

-11-

be described as a political motive based on the information the court has." The IJ, therefore, said, "the court is inclined to give the respondent the benefit of the doubt on the issue of past persecution and will so find." The IJ went on to state that "having found past persecution, that creates only the presumption of a well-founded fear of future persecution and the burden has shifted to the Government to show a change of conditions that would rebut that presumption" (emphasis supplied).

The IJ discussed and credited the 2003 Department of State country conditions report for Cambodia. According to the IJ, "this Court notes that the situation in Cambodia has changed significantly, in a political sense, from the situation that existed when the respondent was involved in politics four years ago." The IJ quoted from the report section on Human Rights Practices for the Year 2003 that "the government did not coerce or forbid membership in political organizations. Political parties normally were able to conduct their activities freely without government interference . . . ." The IJ also quoted from a later section of the report describing the 2003 elections in which, for the first time, local level elections were held for the purpose of electing commune councilors for 1,621 communes in Cambodia. The IJ noted that the Sam Rainsy party had won 1,346 seats across those 1,621 communes, and that while the People's Party was again victorious, they were required to share power with the other

parties in all but 148 of those communes. According to the report, the transfer of power to the newly elected councilors was smooth. The IJ concluded: "On the basis of this report and for other reasons, the Court finds that the government has successfully rebutted the presumption of a well-founded fear of future persecution."

While finding the government had successfully rebutted the presumption, the IJ went on to note that when "arrested and held by the government for three days in June of 2000 he [Chreng] was not beaten or tortured and admittedly encountered 'no problems.'" The IJ continued: "Although the government was looking for him allegedly to arrest him in November of 2000, there is no way of telling whether he would have been mistreated in connection with that arrest or whether the government had any legitimate basis for that arrest. The respondent did not stick around to find out so it is not just the report on country conditions that would support the conclusion that there is not an adequate basis to find objectively a well-founded fear, but there is also the fact that respondent, in personal persecution terms, was not treated in such a way as to suggest he would be tortured or killed because of his connection to the Sam Rangsi [sic] Party."

The IJ then stated, "Having made these findings, the Court makes the further finding that the respondent [Chreng] has not met his burden with regard to his eligibility application for

asylum.    Accordingly, that application for asylum is hereby denied."  The IJ went on to state that since Chreng had failed to meet the more lenient standard for asylum, it follows that he fails to meet the more stringent standard for withholding of removal. Regarding CAT relief, the IJ held that there was no suggestion that the government of Cambodia would be likely to torture petitioner should he return to Cambodia.

### III.  Chreng's Appeal to the BIA

In his motion of appeal to the BIA, Chreng asserted he had no objection to the immigration court's recitation of the facts but believed that it was unfair for him to have to show both that he experienced past persecution <u>and</u> also that present country conditions made it dangerous for him to return to Cambodia, in light of his individual circumstances.  He also alleged that he had learned of the importance of present country conditions only after his testimony, and that if the granting of immigration relief necessitated such evidence, then he should be entitled to present the same.  The petitioner asked the BIA to remand the case to the IJ for further testimony regarding country conditions.

The BIA expressly adopted and affirmed the decision of the IJ.  It also stated: "The Immigration Judge correctly concluded that the Department of Homeland Security (DHS) successfully rebutted the presumption of future persecution by demonstrating that country conditions had changed in Cambodia."  The BIA denied

-14-

Chreng's motion to remand stating that the relevance of the present-day country conditions "requirement" (sic) was evident from agency regulations. It noted that Chreng had not presented any prima facie evidence that country conditions in Cambodia were such that he would have a well-founded fear of persecution if he returned to his country of origin.

## IV. Discussion

Chreng argues in his petition on appeal that the IJ and the BIA erred in finding that the government had successfully rebutted the presumption of a well-founded fear of future persecution. He contends that the IJ misread the country conditions report and seeks reversal or remand of the decision.

We begin with the premise that the IJ and BIA did, in fact, find that Chreng had experienced past persecution, leading to the rebuttable presumption that he had a well-founded fear of future persecution were he to return to Cambodia. This leaves open the question whether there was substantial evidence to support the IJ's and the Board's further findings that the government had rebutted this presumption. We believe there was.[2]

---

[2]While the IJ's language, quoted previously in this opinion, indicates a finding of past persecution, the IJ went on to say, somewhat murkily, that "in personal persecution terms," Chreng may not have been treated so as to suggest he would be tortured or killed because of his connection to the Sam Rainsy party. The government seizes upon this language as undermining the finding of past persecution, arguing that because Chreng did not appeal from this language to the BIA, he failed to exhaust administrative remedies, leaving us without jurisdiction. But we think that the

-15-

Determinations denying asylum are reviewed for substantial evidence. The Board's decision will be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). This standard is deferential: the Board's decision must be upheld unless "the record evidence would compel a reasonable fact finder to make a contrary determination." Guzman v. INS, 327 F.3d 11, 15 (1st Cir. 2003) (citing Aguilar-Solis v. INS, 168 F.3d 565, 569 (1st Cir.1999)).

A petitioner's well-founded fear presumption can be rebutted by a showing that conditions in the applicant's native country have so changed that he no longer has a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1)(i)(A)-(B); see El Moraghy v. Ashcroft, 331 F.3d 195, 203 (1st Cir. 2003). When the conditions in the country of origin have changed so dramatically as to undermine the well-foundedness of the fear, the presumption disappears and the applicant is not entitled to asylum. Civil v. INS, 140 F.3d 52, 66 (1st Cir. 1998). However, changes of only a very general nature in country conditions may not suffice. Quevedo v. Ashcroft, 336 F.3d 39, 44 (1st Cir. 2003). To rebut the presumption, the changes must be such as to "have negated the

IJ's and the BIA's basic assumptions -- that Chreng was subjected to past persecution so as to give rise to the presumption of future persecution -- are manifest. Additionally, as we agree with the IJ and the BIA that the presumption of future persecution was rebutted, we need not further consider this contention.

particular applicant's well-founded fear of persecution." <u>Fergiste</u> v. <u>INS</u>, 138 F.3d 14, 19 (1st Cir. 1998). Account must be taken of the individual's particularized substantiated fear. <u>See</u> <u>Yatskin</u> v. <u>INS</u>, 255 F.3d 5, 10 (1st Cir. 2001).

In this case, the government's rebuttal took the form of the circumstances presented in the 2003 country conditions report. While "[t]he advice of the State Department is not binding," <u>Gailius</u> v. <u>INS</u>, 147 F.3d 34, 45 (1st Cir. 1998) (citations and internal quotation marks omitted), State Department reports are "generally probative of country conditions." <u>Palma-Mazariegos</u> v. <u>Gonzales</u>, 428 F.3d 30, 36 (1st Cir. 2005). Evidence in these reports never "<u>automatically</u> trump[s]" petitioner's specific evidence, <u>Waweru</u> v. <u>Gonzales</u>, 437 F.3d 199, 203 (1st Cir. 2006) (citations and internal quotation marks omitted) (emphasis in original), and is "open to contradiction," <u>Zarouite</u> v. <u>Gonzales</u>, 424 F.3d 60, 63 (1st Cir. 2005). Further, as already noted, "abstract evidence of generalized changes in country conditions, without more, cannot rebut a presumption of a well-founded fear of future persecution." <u>Palma-Mazariegos</u>, 428 F.3d at 35. However, where a report demonstrates fundamental changes in the specific circumstances that form the basis of a petitioner's presumptive fear of future persecution, it "may be sufficient, in and of it itself," to rebut that presumption. <u>Id.</u> at 36. The latter appears to be the case here, as the IJ and the BIA effectively found.

-17-

Chreng's claim of fear relied on how the People's Party was treating members of the opposition. The IJ found that the country conditions report negated Chreng's fears of future ill-treatment. Political parties, according to the report, were now able to conduct their activities with relative freedom. In particular, the People's Party was now forced by the results of recent elections to work in conjunction with the FUNCINPEC and the Sam Rainsy parties, as each of the latter had shared to some degree in the victory. The report stated that the CPP had won 73 seats in the National Assembly, while the FUNCINPEC party won 26 seats and the Sam Rainsy party 25 seats. No party won the two-thirds majority required to form a government. The IJ also took note of the report's finding that in 2002, following the first national commune local-level elections, the CPP had won the most seats, but the Sam Rainsy party had also won 1,346 seats in 1,621 communes. As a consequence, the CPP party was required to share power with other parties in all but 148 of those communes. Moreover, the government was not forcing its citizens to join any particular party, and power had been transferred smoothly.

The report also said there had been no politically motivated disappearances and no reports of political prisoners. There was greater media access for political parties and candidates and a general governmental respect for the right to associate. Political parties, moreover, were able to conduct their activities

freely without government interference. There had been a decline in political violence during the July 2003 National Assembly elections; a smooth transfer of power to newly elected commune councilors; no government coercion or prohibition as to membership in political organizations; and a need for all three major political parties to work together towards a new coalition, as no party had won the required majority to form a government. See also Ouk v. Gonzales, 464 F.3d 108, 111 (1st Cir. 2006) (finding no well-founded fear of future persecution for member of Sam Rainsy party and citing the 2003 Cambodia country conditions report for the fact that there were no reports of politically motivated disappearances or of political prisoners); Ang v. Gonzales, 430 F.3d 50, 57 (1st Cir. 2005) (finding no well-founded fear of future persecution and noting that "[t]he FUNCINPEC and the CPP are both integral parts of the coalition government that now rules Cambodia"). We think the Department of State's country conditions report provided substantial evidence to support the IJ's and BIA's finding that the government had rebutted the presumption of future persecution.

Once the government rebutted the presumption, the burden shifted back to petitioner to show the existence of new sources of possible persecution. In Re N-M-A, 22 I&N Dec. 312, 321 (BIA 1998). Chreng argued to the BIA he did not know until it was too

late that he had to produce any such further evidence.[3] But the need to do so followed from the same statute and accompanying regulations under which he sought immigration relief. Under 8 C.F.R. § 208.13(b)(1)(iii)(2005), once the government has rebutted the presumption, an "applicant may be granted asylum based on past persecution alone if 1) the applicant has demonstrated compelling reasons for being unwilling or unable to return to his country of nationality or last habitual residence; or 2) the applicant has established that there is a reasonable possibility that he may suffer other serious harm on return to that country." Hernandez-Barrera v. Ashcroft, 373 F.3d 9, 23 (1st Cir. 2004). Chreng was thus on notice that further evidence would be needed in the event

---

[3]Chreng does not on appeal refer to the statements he submitted to the IJ from Madeleine Albright and Bill Frist condemning comments and veiled threats made by Hun Sen in 2004 against the Sam Rainsy Party. These can be said to cast a shadow on the more optimistic assessment issued in 2003 by the Department of State but, by themselves, were not enough to establish that Hun Sen and his people were actually re-engaging in systemic violence against the adherents of the Sam Rainsy Party. Given the 2003 country conditions report, we cannot say that a reasonable fact-finder must find that Chreng had a well-founded fear of future persecution should he be returned home at this time. That a country's politics remain volatile, leaving open the possibility of deterioration and including some measure of sporadic violence, does not necessarily establish an alien's well-founded fear of future persecution should he be returned to that country. As noted earlier, Chreng did not take issue with the country conditions report during the IJ's hearing. In his appeal to the BIA, Chreng acknowledged that he had not addressed the issue of future persecution: "It is patently unfair that the Respondent must present his asylum case based upon past persecution without knowing that he must also make the case that country conditions presently, based upon his individual circumstances, make it dangerous for him to return to Cambodia" (emphasis in original).

the IJ determined, as he did, from the country conditions report that the presumption had been rebutted.

Chreng argues that a "full reading of the Country reports on Human Rights Practices for Cambodia (2003) . . . shows beyond any doubt that Cambodia is still a very imperfect and troubled society, and that the Appellant is justifiably frightened to return there." It is true that the country report describes ongoing human rights violations and systematic deficiencies in the political process, but it also outlined significant and specific improvements in the political atmosphere, as well as plausible reasons for believing that violence against members of the Sam Rainsy Party had lessened. With sufficient evidence of changed country conditions in the political sphere and no error in the IJ's reliance on or interpretation of the country conditions report, we believe the agency's denial of asylum must stand. Asylum is a matter committed in major degree to the immigration agencies, which are entitled within reasonably broad parameters to make their assessments, provided always there is substantial evidentiary support.

This conclusion also disposes of Chreng's withholding of removal claim. As noted earlier, that claim places a "more stringent burden of proof on an alien than does a counterpart claim for asylum." Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005). While eligibility for asylum requires a well-founded fear of future persecution, withholding of removal requires that

the alien show a clear probability of future persecution.  <u>See</u> <u>Aguilar-Solis</u>, 168 F.3d at 569 n.3.  It follows, then, that, because the petitioner's claim for asylum fails, so too does his counterpart claim for withholding of removal.[4]

The petition for review is denied.

---

[4]Chreng also argues in his brief on appeal that in some cases involving past persecution, even if there is little likelihood of future persecution, asylum may be granted as a matter of discretion for humanitarian reasons if the alien has suffered an atrocious form of persecution.  Even assuming arguendo such exceptional circumstances might exist here, Chreng did not raise this argument before the IJ or the BIA, and thus it is waived.