[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11920

_____

Agency No. A097-192-098

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 12, 2010
JOHN LEY
CLERK

VISCA IMELDA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(July 12, 2010)

Before TJOFLAT, WILSON and EBEL,[*] Circuit Judges.

---

[*]Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

WILSON, Circuit Judge:

Visca Imelda, an ethnic Chinese Christian and native and citizen of Indonesia, petitions for review of the Board of Immigration Appeals's("BIA") order affirming the immigration judge's ("IJ") decision denying her application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). After review of the parties' briefs and the record, and with the benefit of oral argument, we grant the petition for review, vacate the BIA's decision, and remand.

## I. BACKGROUND

In August 2000, Imelda was admitted to the United States as a non-immigrant B2 visitor with authorization to remain until February 2001. In 2003, Imelda signed an asylum application, seeking asylum or withholding of removal on account of race and religion, and also seeking CAT relief. In December 2005, the Department of Homeland Security issued Imelda a notice to appear, charging her with removability pursuant to 8 U.S.C. § 1227(a)(1)(B) as an alien who remained in the United States for a time longer than permitted. On June 8, 2006, Imelda conceded removability.

2

At an October 31, 2007 merits hearing before the IJ, Imelda provided evidence to support her claims for asylum, withholding of removal, and CAT relief. Imelda, a Protestant Chinese Indonesian from the Minahasa District of North Sulawesi, Indonesia, testified about three different incidents of persecution. First, in 1988, Imelda and her friend, Maria, were singing Christian worship songs when they were attacked by native Indonesians. The natives threw bottles at Maria and mocked the girls' Chinese ethnicity. As the natives pushed the girls, Imelda's teacher, also a Chinese Indonesian, attempted to help them and was stabbed in the shoulder. Another native asked Imelda, "Hey, Chinese, do you want to be raped[?]" A.R. 88. Police officers arrived and asked the natives to leave, but blamed Imelda for the incident and told the teachers to refrain from singing Christian songs in public. *Id.*

The second incident occurred in December 1995, when Imelda attended a church Christmas party. The house where the party was held was ransacked by a group of Muslim men calling themselves the "Jihad youth." They accused Imelda and her friends of holding secret meetings and planning to build a church, and they prevented them from leaving the home. Imelda was taken to a separate room where she was stripped down to her underwear, tied up, and left for several hours. The individuals then brought two of Imelda's friends into the room, undressed them, and proceeded to touch the girls inappropriately. Before departing, the

3

group's leader warned the Christians that Muslims would take over the Minahasa District and that "you Christian dogs . . . all will die." *Id.* at 91.

The third incident occurred in 1999. Imelda and her husband opened a grocery store, in which they held church services every Monday night. A police officer told Imelda that they could not hold such illegal services, and asked for a bribe to "safeguard" the store. Despite giving the officer money, the store was robbed in August 1999. An individual at an Islamic school called Imelda several times, and informed her that the robbery had occurred in response to the church services and that Imelda and her husband were breaking Muslim law. Subsequently, another Muslim offered to purchase the store. Imelda testified that she had to sell the store because her vendors refused to supply her with merchandise. Upon hearing Imelda's opening price, the man asked her if she wanted the store to be burned and destroyed. Ultimately, Imelda sold the store for much lower than her opening price.

Finally, Imelda testified that while the situation in Indonesia seemed to be getting better from the outside, attacks on Christians and other acts of violence still occurred. In addition to Imelda's testimony were several documentary exhibits. One exhibit, presented by the government, was the 2006 United States Department of State's Country Report for Indonesia ("2006 Country Report" or "Report"). *See* U.S. Dep't of State, Indonesia, 2006 Country Reports on Human Rights Practices

(Mar. 6, 2007), *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78774.htm.

The other exhibits pre-dated the Country Report, ranging from 2001 to 2005.

Imelda provided a 2002 letter from her parents stating that the current safety

situation in Imelda's home province was getting worse after the arrival of

terrorists, that a bomb was found in a church, that her parents' church had received

bomb threats, and that a pastor from Imelda's home town had disappeared. Imelda

also submitted newspaper articles reporting the 2005 attacks in Bali by Muslim

suicide bombers. Other articles recounted the forceful closing of a number of

churches by Muslim groups. Finally, articles from 2001 and 2002 reported that on

the islands of Maluku and Sulawesi in eastern Indonesia, there was ongoing

fighting between Christians and Muslims, exacerbated in 2000 by the arrival of

Laskar Jihad, a radical Islamic militia.

After the hearing, the IJ denied Imelda's claims for asylum, withholding of

removal, and CAT relief. Because Imelda did not raise her claims for asylum and

CAT relief in her appellate brief, those issues are deemed abandoned, and we

review only her withholding of removal claim.[1] *See Sepulveda v. U.S. Att'y Gen.*,

401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam). As to the withholding of

---

[1] The IJ ruled that Imelda was ineligible for asylum because she failed to file her asylum application within one year after the date of her arrival in the United States. *See* 8 U.S.C. § 1158(a)(2)(B). The IJ also found that the she failed to demonstrate that she would be tortured upon her return to Indonesia, precluding her from CAT relief. *See* 8 C.F.R. § 208.16(c).

removal claim, the IJ found that Imelda had established neither past persecution nor that it would be more likely than not that she would suffer a future threat to her life or freedom on account of her religion or race. The IJ found that the events of which Imelda complained did not "rise to the level of persecution."[2] A.R. 30.

The BIA's decision assumed past persecution and stated that even if Imelda "had established past persecution, . . . [it] would find that the presumption of future persecution is rebutted" because of a "fundamental change in circumstances." *Id.* at 3. On appeal, Imelda challenges the BIA's determination that there has been a fundamental change in country conditions sufficient to rebut her presumption that her life or freedom would be threatened upon return to Indonesia based on her religion and race. Imelda argues that the BIA erred in relying on the Country Report alone in making its determination, that it did not make an individualized finding in relation to Imelda's situation, and that the changed conditions described in the Country Report are not fundamental because persecution still exists for Christians and ethnic Chinese in Indonesia.

## II. STANDARD OF REVIEW

We review only the BIA's decision because it did not expressly adopt the IJ's opinion or reasoning. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir.

---

[2] The IJ did not make any finding as to whether, assuming past persecution, there had been fundamental changes in country conditions such that Imelda's life or freedom would not be threatened upon return to Indonesia. The BIA made this determination in the first instance.

6

2001).  We review a factual determination that an alien is statutorily ineligible for withholding of removal under the substantial evidence test, which requires affirmance if the BIA's decision "is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *Id.* at 1283–84 (internal quotations and citations omitted).  The fact that evidence in the record may support a conclusion contrary to the administrative findings is not enough to justify a reversal.  *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc) (citation omitted).  Under the substantial evidence standard, "we must find that the record not only supports reversal, but compels it."  *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003) (citation omitted).

### III.  DISCUSSION

To seek withholding of removal, an alien must demonstrate that her "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  An alien bears the burden of showing that she "more-likely-than-not would be persecuted or tortured upon [her] return to the country in question."  *Mendoza*, 327 F.3d at 1287.

If the alien demonstrates past persecution, there is a presumption that her "life or freedom would be threatened upon return to [her] country."  *Id.*; 8 C.F.R. § 208.16(b)(1)(i).  However, this presumption can be rebutted if the government

7

shows, by a preponderance of the evidence, that (1) "[t]here has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of [race, religion, nationality, membership in a particular social group, or political opinion] upon the applicant's removal to that country;" or (2) "[t]he applicant could avoid a future threat to . . . her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.16(b)(1)(i)–(ii).[3]

A. *Standard Applied by the BIA*

As an initial matter, it is unclear from the BIA's opinion whether it relied on the standard for asylum, rather than the more stringent standard for withholding of removal, in determining what presumption was at issue. The appropriate standard for withholding of removal is whether there are fundamental changes such that the applicant's "life or freedom would not be threatened." 8 C.F.R. § 208.16(b)(1)(i)(A). At first, the BIA's opinion states that Imelda "no longer has a

_____

[3] There is a distinction between establishing future persecution as a separate claim and rebutting the presumption of future persecution. Once past persecution, and consequently a presumption of future persecution, is established, the burden is on the government to rebut the presumption. However, if the petitioner has not established past persecution, there is no presumption to overcome, and the burden is on the petitioner to demonstrate a future threat to her life or freedom on a protected ground. *Mendoza*, 327 F.3d at 1287; *Molina-Estrada v. INS*, 293 F.3d 1089, 1096 (9th Cir. 2002). Here, the BIA assumed past persecution and discussed whether the presumption of future persecution had been adequately rebutted by the government.

8

well-founded fear of persecution in Indonesia," the standard for asylum. A.R. 4; *see* 8 C.F.R. § 208.13(b)(1)(i)(A). However, it goes on to say that "there has been a fundamental change in circumstances such that the respondent has not established that she is more likely than not to face persecution in Indonesia," which is the standard for withholding of removal. *Id.*; *see Mendoza*, 327 F.3d at 1287.

B. *Fundamental Change in Circumstances*

We have held that the BIA may rely heavily on State Department reports about a country. *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004) (allowing the BIA to use such reports to determine whether the Peruvian government presently acquiesced in activities of a Peruvian terrorist group, as required for CAT relief). However, "[u]se of country reports cannot substitute for an analysis of the unique facts of each applicant's case." *Gitimu v. Holder*, 581 F.3d 769, 773 (8th Cir. 2009) (citation omitted). We agree with our sister circuits that information about general changes in a country is insufficient; instead, the determination of whether the presumption is rebutted "requires an individualized analysis that focuses on the specific harm suffered and the relationship to it of the particular information contained in the relevant country reports." *Chand v. INS*, 222 F.3d 1066, 1079 (9th Cir. 2000); *see also Gitimu*, 581 F.3d at 773; *Uruci v. Holder*, 558 F.3d 14, 19–20 (1st Cir. 2009); *Alibasic v. Mukasey*, 547 F.3d 78, 87 (2nd Cir. 2008) (citation omitted); *Palma-Mazariegos v. Gonzales*, 428 F.3d 30, 35

(1st Cir. 2005); *Chen v. INS*, 359 F.3d 121, 130 (2d Cir. 2004); *Berishaj v. Ashcroft*, 378 F.3d 314, 327 (3rd Cir. 2004) (citation omitted) (noting that the First, Seventh, Ninth, and Tenth Circuits require an individualized analysis and that other circuits apparently "have had no occasion to consider the matter"); *Molina-Estrada*, 293 F.3d at 1096 (citation omitted); *Krastev v. INS*, 292 F.3d 1268, 1276–77 (10th Cir. 2002); *Kaczmarczyk v. INS*, 933 F.2d 588, 594 (7th Cir. 1991).[4]

While there is no bright line rule for what constitutes a "fundamental change," it must be a change sufficient to rebut the presumption that an alien's life or freedom would be threatened upon return to the country of origin. *See* 8 C.F.R. § 208.16(b)(1)(i)(A). For instance, this Court has found changed country conditions where the government entered into a peace accord with the guerilla groups accused of persecuting the petitioner, and such groups had been dissolved by law. *Mendoza*, 327 F.3d at 1288.[5] Other circuits have found that substantial evidence has supported a fundamental change where, for example, there has been a change in the government that persecuted the petitioner, or where the group that

---

[4] In *Shehu v. Gonzales*, the Fifth Circuit stated it has not decided "what limitations should be placed on inferences that can be drawn from generalized evidence of changed country conditions," but that even if it did "require the government to negate the applicant's individual fear of persecution, the evidence effectively negates [her] individual fear of persecution." 443 F.3d 435, 437 (5th Cir. 2006).

[5] We also summarily held, in the asylum context, that substantial evidence supported a finding of changed country conditions in Albania. *Mehmeti v. U.S. Att'y Gen.*, 572 F.3d 1196, 1200 (11th Cir. 2009) (per curiam).

10

persecuted the petitioner has been taken out of power, dissolved, or assimilated into the government.[6] Courts have also found a fundamental change where the government has undertaken significant reforms to redress past problems, such as punishing persecutors or establishing certain freedoms by law, or where the evidence demonstrates a substantial decline in violence against persecuted groups.[7]

---

[6] *See, e.g.*, *Milanouic v. Holder*, 591 F.3d 566, 570 (7th Cir. 2010) (presumption from past persecution by Slobodan Milosevic and the Socialist party was rebutted by removal of Milosevic from power); *Gitimu*, 581 F.3d at 774 (presumption from past persecution due to membership in political party rebutted when the leader of that party was elected President of Kenya, there were no reports of political killings or arrests, and petitioner's family remained in Kenya without persecution); *Lybesha v. Holder*, 569 F.3d 877, 881–82 (8th Cir. 2009) (presumption from past persecution due to membership in Democratic Party rebutted where Democratic Party assumed power); *Uruci*, 558 F.3d at 18, 19 (same); *Pascual v. Mukasey*, 514 F.3d 483, 488 (6th Cir. 2007) (presumption from past persecution based on conscription and treatment by civil patrol and abduction by guerillas in Guatemala rebutted because civil war had ended and civil patrol had been disbanded); *Chreng v. Gonzales*, 471 F.3d 14, 22 (1st Cir. 2006) (presumption from past persecution based on how the People's Party was treating members of opposition rebutted when People's Party was forced to share power with the opposition, there were no reports of politically motivated disappearances or political prisoners, and political parties were able to conduct their activities with relative freedom); *Shehu*, 443 F.3d at 439–40 (presumption from past persecution at the hands of the Serbian-dominated police or Serbian paramilitary forces rebutted where the Serbs were no longer in control of the government of Kosovo); *Palma-Mazariegos*, 428 F.3d at 35–36 (presumption from past persecution from Guatemalan guerillas rebutted because guerillas that persecuted petitioner were assimilated into the government and so did not need to engage in militant activities, and no such activities occurred); *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004) (presumption from past persecution from Communist and Democratic Party governments rebutted because Socialist Party was in power); *Yatskin v. INS.*, 255 F.3d 5, 10 (1st Cir. 2001) (presumption from past persecution by Communist government rebutted with the dismantling of the Soviet Union); *Woldemeskel v. INS.*, 257 F.3d 1185, 1188, 1190 (10th Cir. 2001) (presumption from past persecution by former government rebutted with change in government that had persecuted petitioner and concomitant change in country conditions).

[7] *See, e.g.*, *Sowe v. Mukasey*, 538 F.3d 1281, 1286 (9th Cir. 2008) (presumption from past persecution by members of the Revolutionary United Front ("RUF") rebutted where members of RUF had been tried before a war crimes tribunal and where the government was taking action against the group); *Bollanos v. Gonzales*, 461 F.3d 82, 86 (1st Cir. 2006) (presumption from past persecution based on political efforts to advance the rights of ethnic minorities rebutted where two State Department reports stated that that politically-motivated violence "decreased

Fundamental change is certainly not limited to the above examples, nor do such situations always reflect fundamental change; instead, it is a fact-specific inquiry that must be tailored to the petitioner's situation, and must be sufficient to demonstrate, in the withholding of removal context, that a petitioner's life or freedom would not be threatened if he or she was returned to his or her country of origin.

To support its finding that there has been a fundamental change in country conditions in Indonesia, the BIA relied solely on the 2006 Country Report, stating that although it "identifies a few sporadic incidents of tension between religious groups, [it] also indicates that there have been improvements in the relations between religious groups." A.R. 4. The opinion asserts that the incidents of conflict in the Report do not rise to the level of persecution. Furthermore, the BIA found that "although there is ongoing discrimination against Indonesians of Chinese ethnicity, '[i]nstances of discrimination and harassment of ethnic Chinese continued to decline compared with previous years.'" *Id.* (alteration in original) (quoting 2006 Country Report). Consequently, the BIA held that "there has been a

significantly," elections were conducted under a new electoral code that addressed many of the problems from previous elections, elections were generally free of violence with no police interference, the candidate representing the Greek minority (petitioner's cousin) won elections in his hometown, and Greeks participated actively in politics); *Kharkhan v. Ashcroft*, 336 F.3d 601, 603, 605 (7th Cir. 2003) (presumption from past persecution because petitioner was not allowed to go to church was rebutted because Ukraine has since permitted Catholic churches to operate in the country, and its constitution was amended to guarantee religious freedom to all).

fundamental change in circumstances such that the respondent has not established that she is more likely than not to face persecution in Indonesia." *Id.*

According to the Report, acts of violence and discrimination against Christians has lessened from previous years, with support from the government, in the provinces of Central Sulawesi and Maluku. The Report relates that "[r]eligiously motivated violence . . . in Central Sulawesi, Maluku, and North Maluku occurred less frequently than in previous years," that "[r]eligious and ethnic conflict in Central Sulawesi abated somewhat during the year," and that "Maluku Province saw greatly reduced ethnic and religious tensions during the year," with cooperation among religious leaders. A.R. 116, 117, 128–29. The Report notes that the "[g]overnment and police continued to make some progress in handling conflicts in Central Sulawesi and Maluku" by capturing suspects in certain attacks on Christians, and that non-governmental organizations ("NGOs") aided in encouraging cooperation between religious groups.[8] *Id.* at 116, 127. The Report records a decline in murders in Central Sulawesi from thirty-seven in 2005 to eight, and a decline in injuries from 104 to three, due in part to increased police presence in the province. *Id.* at 116. Finally, the government passed a law in response to attacks on unregistered houses of worship, allowing a permit for a

---

[8] The Report also notes that overall, "police professionalism remained low, as did their respect for human rights and effectiveness at investigating human rights abuses." A.R. 120.

13

house of worship to be issued if it is petitioned in a signed statement by at least ninety congregation members and sixty other community members. *Id.* at 127. However, some criticized the new law for still requiring consent by community members and for the high number of congregation members required to sign the petition. *Id.*

Besides this law, the Report does not mention changes for Christians in any other parts of Indonesia, such as where Imelda had lived, or even the country generally.[9] When it does mention Indonesia generally, the Report explains that among the "human rights problems occurr[ing] during the year" was "interference with freedom of religion by private parties, sometimes with complicity of local officials" and "intercommunal religious violence." *Id.* at 114. Furthermore, the Indonesian government passed a law reaffirming the longstanding requirement that the National Identity Card ("KTP"), which all citizens must carry, identify the holder's religion. According to some NGOs, this requirement "endangered cardholders who traveled through areas of interreligious conflict." *Id.* at 123. The government also "took no concrete steps to implement controversial provisions" of

---

[9] The Report does state that in March 2006, in South Sulawesi, 100 members of the militant Islamic group Laskar Jundullah ransacked the office of two foreign university lecturers and long-time residents because they translated the Bible into the local dialect. The local police dispersed the crowd after allowing them to search the office. A.R. 127. In September 2005, a court in West Java sentenced three women to three years in prison for proselytizing because they included Muslim children (with parental permission) in Christian Sunday school activities. *Id.* In Madura, a non-Indonesian and a citizen were arrested for corrupting the Muslim community. *Id.*

an education law that would require religious instruction to students in their own faith. *Id.* at 127.

Moreover, although the Report illustrates that tensions may have "abated somewhat" or "occurred less frequently" in the Central Sulawesi and Maluku Provinces, it also makes clear that acts of violence directed at Christians still occurred in those areas. For instance, the Report explained that "Central Sulawesi continued to experience sporadic bombings, shootings, and other violence." *Id.* at 129. This included a bomb detonated in an empty church in Poso and the killing of a reverend in Central Sulawesi. *Id.* at 116, 129. A Christian woman was stabbed and killed while riding public transportation through a predominantly Muslim area of Poso City. *Id.* at 116. In 2005, a bus attack by Muslim residents killed four and injured fourteen Christian passengers in the Ambon district, and three Christian schoolgirls were beheaded in Central Sulawesi. *Id.* at 116, 117. In 2004, two churches were bombed, two Christian priests were murdered, and a Pentecostal minister was abducted in Maluku Province. *Id.* at 118.

After examining the record, we are compelled to conclude that the government has not met its burden of demonstrating a fundamental change in country conditions such that Imelda's life or freedom would not be threatened upon removal to Indonesia based on her religion. The BIA did not engage in a sufficient, individualized analysis. While it discussed the treatment of Christians

15

and Chinese in Indonesia, which is tailored to Imelda's claims of persecution, the 2006 Country Report only records improvements in the provinces of Central Sulawesi and Maluku. It makes no mention of Imelda's home province, the Minahasa District of North Sulawesi, where her past incidents of persecution occurred, nor does it discuss improvements for Christians generally in Indonesia.

Furthermore, while there is an indication of improvement in those provinces, the Report makes clear that religious violence still occurs. *See, e.g.*, *Chand*, 222 F.3d at 1079 ("It is not surprising that while racial or religious conditions may have improved generally, a number of individuals may continue to be subjected to acts of persecution on a regular basis. It may be true that in some regions of the country conditions are better than in others, or even that there are some villages in which persecution reigns and others in which it is entirely absent."); *Ali v. Ashcroft*, 394 F.3d 780, 789 (9th Cir. 2005) ("We have repeatedly found that the DHS has not rebutted the presumption of a well-founded fear of persecution when evidence in country reports indicates that persecution similar to that experienced by the petitioner still exists."); *Awale v. Ashcroft*, 384 F.3d 527, 531 (8th Cir. 2004) (noting that while general conditions may have improved in Somalia, inhabitants of the specific area in which petitioner had lived still experienced persecution).

While we do not require unrealistic specificity from the government in establishing changed conditions, it is insufficient to point to two regions in a

16

country—regions in which the petitioner did not live—and conclude that fundamental changes have occurred because there were some improvements in those regions.

In its analysis for fundamental changes in circumstances for ethnic Chinese in Indonesia, the BIA also relied on the 2006 Country Report. The Report states that "[i]nstances of discrimination and harassment of ethnic Chinese continued to decline compared with previous years," and that "[r]ecent reforms increased religious and cultural freedoms." *Id.* at 138.[10] The statement that harassment against Chinese has "continued to decline" from previous years does not indicate the extent to which it has declined, and the government failed to proffer any evidence in the record of other State Department reports that could have tracked this decline. The Report also does not make any mention of the treatment of ethnic Chinese who are also Christians.[11]

Given our consideration of the evidence, we are compelled to find that the

---

[10] The reforms were the revocation of a previous presidential decree requiring special permits to engage in Chinese cultural and religious celebrations, and a new citizenship law which states that an Indonesian citizenship certificate, which had been difficult for ethnic Chinese to obtain, was no longer required. A.R. 138. However, the Report also notes that public servants still discriminated against some ethnic Chinese in issuing marriage licenses and other services. The Report found fifty articles of law, regulations, or decrees that discriminated against Chinese citizens. *Id.* Furthermore, the Report recounted two incidents of threats and violent protests in 2006 against ethnic Chinese based on suspected involvement of two ethnic Chinese in crimes against their employees. *Id.*

[11] In her testimony, Imelda mentioned that those who harassed her in 1988 did not like Christians, especially those who are Chinese. She also stated that the police would not have helped her with the 1995 incident because she was Christian and Chinese.

government failed to meet its burden of proof to show, by a preponderance of the evidence, that there has been a fundamental change in circumstances in Indonesia such that Imelda no longer faced a threat to her life or freedom based on her religion and race. Although the improvements in Indonesia are important, substantial evidence does not support the conclusion that the improvements discussed in the 2006 Country Report rebutted the presumption of a future threat to Imelda's life or freedom. We note that the 2006 Country Report was the most recent evidence and the only State Department report in the record. It is possible that more evidence, such as prior State Department reports, would demonstrate changed conditions in Indonesia, but we determine this case on the record before us.

C. *Relocation*

Neither the BIA nor the IJ considered whether Imelda "could avoid a future threat to [her] life or freedom by relocating to another part of [Indonesia] and, under all the circumstances, it would be reasonable to expect [her] to do so." 8 C.F.R. § 208.16(b)(1)(i)(B). Therefore, we remand for consideration of this issue.

## IV. CONCLUSION

Based on the foregoing, we **GRANT** the petition, **VACATE** the decision of the BIA, and **REMAND** to the BIA for further proceedings consistent with this opinion.

18

TJOFLAT, Circuit Judge, specially concurring:

Given the confusion the Board of Immigration Appeals ("BIA") demonstrated in stating the standard under which it reviewed the immigration judge's ("IJ") decision denying Imelda's application for relief under the Immigration and Nationality Act ("INA"),[1] I write separately to reiterate the straightforward standard that the BIA should apply on remand. If the BIA decides that Imelda suffered past persecution, or assumes that she did, the BIA must inquire whether the Government has shown by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that [Imelda's] life or freedom would not be threatened on account of" her Chinese ethnicity or Christian religion or that she "could avoid a future threat to . . . her life or freedom by relocating to another part of [Indonesia] and, under all the circumstances, it would be reasonable to expect [Imelda] to do so." See 8 C.F.R. § 208.16(b)(1)(i). If the BIA, however, agrees with the IJ's finding that Imelda did not suffer past persecution, the inquiry would be whether Imelda met her "burden of establishing that it is more likely than not" that her life or freedom would be threatened on the

---

[1] The BIA began its discussion by assuming past persecution. There are two problems with the BIA's statement of the law. First, in reviewing Imelda's application for withholding of removal, it stated that there has been "a fundamental change in circumstances such that [Imelda] no longer has a well-founded fear of persecution in Indonesia," which, as the court notes, is the standard for granting an asylum application, not withholding of removal. (Emphasis added.) Second, in concluding, it states that Imelda therefore has "not established that she is more likely than not to face persecution." The court claims that this is the standard for withholding of removal. As I clarify in the text, however, that is not the correct standard if the BIA assumes past persecution.

19

basis of her ethnicity or religion. Id. § 208.16(b)(1)(iii).

I agree that on the current appeal the BIA's decision must be vacated; I would make clear that this decision should be reached on the narrow ground that the State Department's 2006 Country Report on Indonesia—the sole evidence relied upon by the BIA—does not at all address the situation of Chinese or Christian persons in Imelda's province of North Sulawesi.[2] Therefore, if the BIA finds on remand that Imelda suffered past persecution (or assumes that she did), the 2006 Country Report by itself would be insufficient for the Government to meet its burden of showing a fundamental change in circumstances.

---

[2] There are 33 provinces in Indonesia, each with its own local government. As the court notes, the 2006 Country Report describes Central Sulawesi and Maluku as areas where tensions have eased. Central Sulawesi and Maluku are provinces distinct from North Sulawesi; neither shares a border with North Sulawesi.

20